787 So.2d 3 (2000)
UNITED STATES SUGAR CORPORATION, Appellant,
v.
G.J. HENSON, Appellee.
No. 1D99-2798.
District Court of Appeal of Florida, First District.
December 29, 2000.
As Corrected April 5, 2001.
Opinion on Denial of Rehearing April 20, 2001.
*4 Dennis M. Campbell of Thomson, Muraro, Razook, Hart, P.A., Miami; David G. Peltan, U.S. Sugar Corporation, Clewiston; and Eduardo E. Neret of Akerman, Senterfitt & Eidson, Miami, for Appellant.
Raymond Michael Ripple and Donna L. Goodman, E.I. du Pont de Nemours and Company, Wilmington, DE; and William W. Deem of McGuire, Woods, Battle & Boothe, LLP, Jacksonville, for Amicus Curiae *5 E.I. du Pont de Nemours and Company.
Scottie J. Butler, General Counsel, Florida Farm Bureau Foundation, Gainesville, for Amicus Curiae Florida Farm Bureau Federation.
Bernard J. Zimmerman, Kevin G. Malchow, Rusten C. Hurd and Marc A. Consalo of Zimmerman, Shuffield, Kiser & Sutcliffe, P.A., Orlando, for Amici Curiae Alico, Inc.; A. Duda & Sons, Inc.; Barron Collier Partnership; Jack M. Berry, Inc.; Hilliard Brothers of Florida, Ltd.; Stitt Ranch, Inc.; and Frierson Farms, Inc.
Oren S. Tasini of Fleming, Haile & Shaw, P.A., North Palm Beach, for Amicus Curiae Rhone-Poulenc.
H. George Kagan of Miller, Kagan, Rodriguez & Silver, P.A., West Palm Beach, for Amici Curiae Florida Fruit & Vegetable Association; Florida Citrus Mutual; Chemical Manufacturers Association; Florida Fertilizer & Agrichemical Association; American Crop Protection Association; Gulf Citrus Growers.
Mary Ann Stiles and Rayford H. Taylor of Stiles, Taylor & Grace, P.A., Tallahassee, for Amicus Curiae Associated Industries of Florida, Inc.
Nina A. Sachs, Esq. and Randy D. Ellison, Esq., West Palm Beach, for Appellee.
VAN NORTWICK, J.
In this workers' compensation appeal, the United States Sugar Corporation (U.S.Sugar), the employer and servicing agent, appeals an order of the Judge of Compensation Claims (JCC) determining that G.J. Henson, appellee and claimant, is permanently and totally disabled, and that his disability was caused by pesticide[1] exposure in the workplace. Claimant suffered paralysis of the phrenic nerve, a peripheral nerve which supplies the diaphragm, resulting in respiratory and other medical complications which have left claimant virtually confined to a wheelchair and dependent upon a ventilator. Although U.S. Sugar raises several issues on appeal, the only point raised which merits discussion is U.S. Sugar's contention that, under Frye v. United States, 293 F. 1013 (D.C.Cir.1923) and its Florida progeny,[2] the JCC erred in admitting the causation testimony of claimant's expert witnesses. Because our de novo review establishes that there is general acceptance in the relevant scientific community both (i) for claimant's general causation theory that certain pesticides to which he was repeatedly exposed over a long period of time can cause peripheral neuropathy, and (ii) for the differential diagnosis methodology employed by claimant's physicians, which they used to exclude the other factors that might cause his condition and to determine that his pesticide exposure specifically caused his injury, we affirm. We also certify a question of great public importance.

Factual Background
The following factual summary is based upon competent substantial evidence in the record.
*6 Henson worked for U.S. Sugar as an agricultural mechanic for 28 years, ending in 1996 when he became disabled. He spent most of his day in the field repairing equipment which had malfunctioned in field operations. When he was asked how often he was in the field when pesticides were being applied, he responded that "50 percent of the time I'd be out there for some reason."
In the area in which Henson worked, there were usually five machines spraying pesticides simultaneously. When one spray machine was not functioning, the other four machines would continue to spray. The spray would visibly drift, and Henson testified that he could smell the pesticides. In order to make repairs, Henson frequently would be required to lie on ground which had been recently sprayed with pesticides. In addition, U.S. Sugar added soap to the pesticides to cause the chemicals to adhere to whatever they touched, including Henson. Further, Henson's truck had no air-conditioning, requiring him to drive to and through the fields with the windows down. At the same time, airplanes conducting aerial spraying would sometimes cover his truck with spray.
The machines on which Henson worked sprayed the pesticides 2,4-D, ametryn and atrazine and were used throughout the year and washed only when it rained.[3] When a pump broke, Henson would be required to take it apart with the pesticides inside. If he was required to remove the hoses on the machine, pesticides would cover his hands and clothes. When the hoppers which distributed the pesticides parathion and mocap (or ethoprop) malfunctioned, Henson would be required to dig the pesticide out of the hopper with his hands.
U.S. Sugar also constructed and used a makeshift mosquito fogger, which worked by dripping malathion onto a hot engine manifold to create toxic smoke, the creation of which is contraindicated by the manufacturer's material safety data sheet (MSDS). When the fogger would malfunction, Henson was required to take it apart and, as a result, malathion and its byproducts would cover his hands and arms.
Henson also testified that he was exposed to other pesticides, including paraquat and azodrin. In addition to the pesticides expressly mentioned by claimant, the U.S. Sugar spray records indicate that the following were also applied while Henson was employed: dursban/chlorpyrifos,[4] guthion, diazinon, dalapon/dowpon,[5] MSMA (methal arsenic acid), asulox, and polado. These spray records reflect the level and identity of the pesticides sprayed at Runyan Farm (where Henson worked) from 1984 to 1996. Spray records are not available for the period before 1984.
According to Henson, he was told these pesticides would not harm him and was not given any training on safety precautions for handling the pesticides. Although U.S. Sugar provided Henson with both leather gloves and latex gloves, he testified that the leather gloves were too cumbersome to use while repairing the equipment, and the latex gloves quickly ripped apart on the equipment. Further, he had no access to soap or wash facilities in the field and did *7 not begin carrying water on his truck until 1994.[6]
Claimant was seen in the U.S. Sugar clinic from 1977 to 1996 with complaints of shortness of breath, nausea, gastritis and muscle weakness. In February 1996, he began seeing his physician for weakness, dizzy spells and shortness of breath. His physician, Dr. Harland, performed a chest x-ray which revealed an elevated right hemidiaphragm. Claimant was referred to Dr. Warshoff, a pulmonologist, who, through a variety of tests, diagnosed claimant with a paralyzed phrenic nerve. Claimant suffered several severe respiratory illnesses and was near death several times. He was treated with steroids and, as a result, developed diabetes. Because of his restrictive lung disease, secondary to phrenic nerve paralysis, claimant has problems clearing secretions, and because the area of the lung next to the paralyzed diaphragm does not absorb enough oxygen, that area of the lung has collapsed.

Claimant's Expert Causation Testimony
At the final hearing, claimant's medical causation testimony was presented by deposition, as is typical in workers' compensation cases.
Dr. Bowsher. Dennis J. Bowsher, M.D., is board certified in clinical pharmacology and toxicology, as well as internal medicine, cardiology, and nuclear cardiology. He was trained in toxicology at Northwestern University, and received a national research award from the National Institutes of Health in 1983-84.
He evaluated the claimant clinically, reviewed U.S. Sugar's spray records and the MSDS sheets for the pesticides identified. In formulating his opinions, he reviewed a number of major textbooks and references in the toxicology scientific community.
Based upon claimant's history and his own examination, Dr. Bowsher concluded that Henson suffers from sleep apnea, motor mononeuritis of both the phrenic nerve controlling the right lung diaphragm and the nerve controlling the movement of the proximal right leg, sensory neuropathies, including partial deafness, loss of sensation in the right leg, and patchy lower extremity peripheral neuropathy, as well as a tremor. He testified that within a reasonable medical certainty, Henson's profound neurological illnesses are directly caused by the pesticides he was exposed to, which included mocap (an organophosphate insecticide), MSMA or methal arsenic acid (an arsenical), 2,4-D, (a herbicide known by several trade names), and atrazine.[7]
Dr. Bowsher explained that insecticides are designed to kill through suffocation, by paralyzing the insects breathing muscles. He explained that "organophosphates transfer their phosphorous group to acetylcholine[8] so at the nerve or muscular junction ... there is ... no enzyme to break it down, the acetylcholine builds and *8 with build up ... there is either tremor or tetani contraction of the muscles." He opined that this biological effect is well-settled, relying upon Ernest Hodgson, Richard B. Mailman, Janice E. Chambers, Dictionary of Toxicology 274 (1988) (organophosphorous insecticides, like parathion and malathion, work by inhibiting acetylcholinesterase (ACHE) which blocks the hydrolysis of the ACHE substrate acetylcholine (ACH), a neurotransmitter. The resultant toxicity is caused by excess stimulation at the neuromuscular junction by an accumulation of acetylcholine.).
Dr. Bowsher explained that whether a small amount of pesticide or other chemicals would cause a response depends not only on the magnitude of the dose, but also on the nature of the dose/response curve for that chemical. Although he acknowledged that these curves have not been established for human beings with respect to these particular chemicals, he testified that it is well known that some individuals experiencing chronic and repeated exposure suffer clinical toxicity, particularly in the case of organophosphates. Pertinent to his opinion that chronic exposure to the subject pesticides is neurotoxic, he also explained that, while the pesticides themselves do not accumulate in the body, their pathology and disease do accumulate. In other words, with each exposure there is likely to be some damage that is not reversed.
When asked if epidemiological studies supported his theory, Dr. Bowsher said that he did not use epidemiological studies, but that he had relied upon several texts and case studies in reaching his opinions. He stated that among the texts he relied upon was Casarett & Doull's, Toxicology the Basic Science of Poison (John Doull, M.D., Ph.D., Curtis D. Klaassen, M.D., Ph.D., & Mary O. Amdur, Ph.D., eds., 2d ed.1980).
As for claimant's diabetes, Dr. Bowsher noted that the diabetes manifested itself for the first time in May 1997, more than a year after his respiratory condition. He opined that, while it is possible for diabetes to cause peripheral neuropathy, the patient must have chronicity of diabetes to obtain such a result; and the time-line in Henson's case was the opposite of what would be necessary to establish chronic diabetes.
Finally, Dr. Bowsher opined that MSMA is a heavy metal arsenic which affects humans the same as it does plants and animals by deactivating enzymes and thereby causing malfunction of bodily organs leading to liver disease, damage to the nerves, and to the skin. The chlorophrenoxy compounds (e.g.2,4-D) are herbicides which kill plants by inhibiting enzymes having to do with the basic metabolism of sugar. The plant cannot produce the basic constituents of metabolism, or life or energy.
Dr. Warshoff. Neal Warshoff, M.D., the board-certified pulmonary specialist who treated claimant, applying a differential diagnosis methodology, eliminated the other possible causes of claimant's problems and concluded that the major contributing cause of claimant's condition was his exposure to pesticides. He testified that, while exposure patients usually improve upon removal from the pesticide exposure, that was not immediately true of the claimant. Dr. Warshoff explained that he would not expect the effects of 28 years of chemical exposure to improve in a month or two. He stated that he has noticed a definite improvement in Henson's condition. During the first several months of 1997, this improving condition was confirmed by U.S. Sugar's own witness, Dr. Brooks, who indicated that claimant's blood gases were normal. This evidence confirmed Dr. Warshoff's belief that the progress of *9 claimant's disease correlates with pesticide exposure.
Dr. Warshoff has treated more than one hundred patients with pesticide exposure, with 25 of such cases involving chronic exposure. Patients with diaphragmatic paralysis (claimant's condition) are referred to him. He has treated many patients with phrenic nerve paralysis, and in these patients, he has found the paralysis is most commonly one-sided.
He opined that claimant had early signs of exposure when he exhibited shortness of breath, but that claimant did not appreciate the significance of the warning signs. As for his opinion that claimant's paralyzed phrenic nerve was caused by pesticide exposure, he relied upon his medical training and commented that "you should be able to pick up any book and find that." In that vein, he testified that organophosphates are known to cause respiratory failure by interfering in the neuromuscular junctions where metabolism occurs, preventing the respiratory muscles from functioning.
Dr. Brown. Jeffrey Brown, M.D., a board-certified clinical neurologist, examined claimant and found that he had diffuse absence of deep tendon reflexes which indicated a generalized peripheral neuropathy. He had features of mononeuropathy multiplex, including the vestibular nerves, both ulnar nerves, the right femoral nerve, and the right phrenic nerve. He testified that most of claimant's deterioration is the result of the nerve problem, which creates a "snowball effect" of other medical problems.
He opined that claimant's pesticide exposure caused his phrenic nerve mononeuropathy within a reasonable medical certainty. When asked why claimant did not have bilateral phrenic nerve paralysis, he answered: "I never cease to be amazed at how patchy something that should be a general systemic insult can sometimes present."
In arriving at his conclusion that claimant's phrenic nerve paralysis was causally related to his exposure, he eliminated the other common causes of nerve damage, applying a differential diagnosis methodology. He noted that organophosphates are absorbed through the skin and distributed by body fluids, and that usually low level exposure causes peripheral problems while high dose exposure causes central nervous system problems. He noted that phrenic nerve paralysis outside trauma (e.g. nerve cut in surgery) was rare, and he would not expect to see a research project on it. When asked on cross-examination, he stated that in offering his opinion he relied on textbooks, not epidemiological studies, specifically citing Neil L. Rosenberg, M.D., Occupational and Environmental Neurology (1995).
Dr. Lichtblau. Craig Lichtblau, M.D., board-certified in physical medicine and rehabilitation, opined that claimant's condition was causally related to his pesticide exposure which had resulted in a 95% permanent impairment rating. He based his opinion of causal relationship on his knowledge, training and experience, claimant's history, claimant's physical exam, and claimant's medical records. He opined that scientific literature supported his opinion, because organophosphates cause axonal neuropathies in every electromyography textbook that discusses it. When asked for support in the literature, he retrieved one text from his office bookshelf, J. Chu-Andrews, R.J. Johnson, Electrodiagnosis: An Anatomical and Clinical Approach (1986). He testified that, in his professional experience, phrenic nerve paralysis was either due to trauma or chemical exposure.
*10 When he was asked if it was generally accepted in the medical community that chronic exposure to organophosphates cause phrenic nerve paralysis, he said, that what is generally accepted is that it causes axonal neuropathies, of which phrenic nerve paralysis would be a textbook example. In short, it was his opinion "the phrenic nerve is paralyzed because it has undergone axonal neuropathy secondary to chronic exposure."

Applicability of Frye in Workers' Compensation Proceedings
Raising an issue of first impression in Florida, U.S. Sugar argues that the Frye general acceptance standard for the admissibility of novel scientific evidence applies in workers' compensation cases. In response, Henson contends that the Florida workers' compensation statutory scheme leaves no room for Frye admissibility issues. First, he submits that, because the workers' compensation scheme is based on "a mutual renunciation of common law rights and defenses by employers and employees alike," section 440.015, Florida Statutes (1995), the common law Frye standard could not be a bar to a claimant's recovery. In addition, he argues that Frye-testing medical testimony in workers' compensation cases would be contrary to section 440.29(4), Florida Statutes (1995), in which the legislature has provided that, upon proper motion, "[a]ll medical reports of authorized treating health care providers relating to the claimant and subject accident shall be received into evidence by the [JCC]." Finally, Henson submits that Frye testing is unnecessary to assure evidentiary reliability, because section 440.13(9)(c) provides for the appointment of expert medical advisors to assist the JCC with issues of medical causation and requires that the EMA opinion "is presumed to be correct unless there is clear and convincing evidence to the contrary."
The courts of other jurisdictions are split as to whether expert opinions in workers' compensation cases should be tested under either the Frye standard or the standard adopted in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For example, in Sheridan v. Catering Management, Inc., 5 Neb.App. 305, 558 N.W.2d 319, 327 (1997)(in Nebraska, "Workers' Compensation Court not bound by usual common-law or statutory rules of evidence" and admission of evidence not subject to either Frye or Daubert); and Armstrong v. City of Wichita, 21 Kan. App.2d 750, 907 P.2d 923, 929 (1995)(neither Frye nor Daubert must be satisfied before physician's opinions, diagnosis or treatment is admissible in a workers' compensation case involving occupational disease, noting that rules of evidence not applicable in workers' compensation proceedings), the courts held that no generally accepted standard should be applied to the admission of scientific evidence in workers' compensation cases. The rationale for excluding Frye testing of evidence was explained by the Armstrong court, as follows:
A claimant's burden of proof in a workers compensation case is to prove that it is more probably true than not true that he or she suffers from a disabling physical condition which is a result of his or her work. To require a claimant to also prove that a diagnosis is one universally recognized by and agreed upon in the medical community is above and beyond the scope and nature of the Workers Compensation Act. To apply the Daubert or Frye standard to a workers compensation case would be to apply technical rules of procedure to which neither the ALJ nor the Board are subject. It also would require us to apply our rules of evidence to those proceedings, and *11 those rules of evidence have been held specifically not applicable.
Armstrong, 907 P.2d at 929.
By contrast, in Green v. Texas Workers' Compensation Ins. Facility, 993 S.W.2d 839, 843 (Tex.App.1999)(court did not abuse discretion in determining doctor's testimony inadmissible under Daubert criteria as refined by Texas Supreme Court in du Pont v. C.R. Robinson, 923 S.W.2d 549 (Tex.1995)); City of Aurora v. Vaughn, 824 P.2d 825, 827 (Colo.App. 1991)(no novel or newly developed device or process utilized by doctor consequently Frye inapplicable); and K-Mart Corp. v. Morrison, 609 N.E.2d 17, 27 n. 9 (Ind.App.1993)(requiring novel scientific evidence to be reliable before it is admissible before the workers' compensation board, noting this was a "smaller hurdle" to overcome than determining general acceptability under Frye), either the Daubert or Frye test was recognized as applicable in workers' compensation cases.
Although we believe the issue is close, we cannot agree with appellee's argument. Frye clearly applies in all civil and criminal litigation in Florida. Further, unlike the Armstrong court, we have held that both the Evidence Code, chapter 90, Florida Statutes, and, prior to the adoption of the Evidence Code in 1976, the common law rules of evidence, of which Frye was a part, apply in workers' compensation proceedings. See Martin Marietta Corp. v. Roop, 566 So.2d 40, 42 (Fla. 1st DCA 1990); Odom v. Wekiva Concrete Prods., 443 So.2d 331, 332 (Fla. 1st DCA 1983); see generally Charles W. Ehrhardt, Florida Evidence § 103.3 (2000 ed.). Finally, Frye's application in workers' compensation cases has been implicitly recognized by the Florida Supreme Court. See Domino's Pizza v. Gibson, 668 So.2d 593, 596 (Fla.1996).
We do share appellee's concern with the impact of applying Frye in workers' compensation cases. The legislature has sought to create an efficient, self-executing workers' compensation system, see section 440.015, Florida Statutes (1995), where the occupational cause of a workers' compensation injury is proven by "objective medical findings," "established to a reasonable degree of medical certainty." Section 440.09(1), Florida Statutes (1995)(emphasis supplied). The imposition of a Frye standard of admissibility of novel scientific evidence will certainly increase the cost and create delay in workers' compensation proceedings. Further, the need to retain experts to establish that the Frye conditions have been satisfied may serve as a deterrent to claimants being able to obtain counsel and prosecute a claim which might involve Frye issues. Finally, we believe the present workers' compensation system allows the JCC to evaluate competing medical testimony and make a determination on causation. See, e.g., Wiley v. Southeast Erectors, Inc., 573 So.2d 946 (Fla. 1st DCA 1991); Martin Marietta Corp. v. Glumb, 523 So.2d 1190 (Fla. 1st DCA 1988); Smith v. Crane Cams, Inc., 418 So.2d 1266, 1269 (Fla. 1st DCA 1982). Because of our concerns expressed here, pursuant to article V, section 3(b)(3), we certify the following question of great public importance to the Florida Supreme Court:
IS A JUDGE OF COMPENSATION CLAIMS REQUIRED TO APPLY THE STANDARDS OF FRYE V. UNITED STATES, 93[293] F. 1013 (D.C.CIR.1923) PRIOR TO ADMITTING EXPERT OPINIONS CONCERNING NOVEL SCIENTIFIC PRINCIPLES OR METHODOLOGIES IN A WORKERS' COMPENSATION PROCEEDING?
In addition, for the same reasons, we suggest that the legislature consider how *12 issues of novel scientific evidence should best be addressed in workers' compensation proceedings.

Procedural Defect
At oral argument, we raised the question of whether appellant had raised its Frye objection timely. For the reasons that follow, we conclude that the Frye issue was not timely raised. Nevertheless, although we believe that the procedural defects here present serious questions of waiver, because a waiver issue has not been raised by appellee and because we are able to affirm on the merits of the Frye issue, we do not address whether the procedural defects have barred appellant's Frye objection and are dispositive of this case.
The depositions of the claimant's medical experts were taken at various times in November and December 1998. Each expert witness opined that a causal relationship exists between the claimant's condition and his employment pesticide exposure. At the depositions, U.S. Sugar objected to the admissibility of the expert testimony on the ground of section 90.702, Florida Statutes, the statute governing admissibility of expert opinion testimony. Frye was not raised as a basis for the objection. Although section 90.702 governs the general admissibility of expert testimony, the statute is "silent as to any requirement that there be general acceptance of a newly developed scientific technique or principle...." Hawthorne v. State, 470 So.2d 770, 783 (Fla. 1st DCA 1985)(Ervin, J., concurring and dissenting).[9] Thus, an objection under section 90.702 does not raise or preserve an objection under Frye.
In addition, in the parties' pretrial stipulation filed initially in June 1997 and supplemented several times through November 1998, U.S. Sugar did not list as an issue in dispute whether the opinions of claimant's experts were inadmissible under Frye or were based on generally accepted scientific principles.
After all depositions were taken, on December 7, 1998, one day before the pretrial hearing and two days before the merits hearing, U.S. Sugar filed a motion in limine, supported by a memorandum of law, seeking to exclude claimant's expert causation testimony based on Frye. The motion argued that claimant's experts were not qualified to render any opinion on causal connection because the opinions were not based on generally accepted scientific principles.
In the final order, the JCC denied U.S. Sugar's Frye motion without holding a separate evidentiary hearing. She ruled that the opinions of claimant's experts were admissible because "the scientific principles undergirding the evidence are so generally accepted in the field of medicine and toxicology so as to render these opinions admissible." The JCC relied upon the testimony of Drs. Warshoff, Bowsher and Brown in finding that claimant's chronic pesticide exposure caused his phrenic nerve paralysis.
Because of the procedures used in workers' compensation cases, we conclude that the appellant's Frye objection was not timely raised. First, the Frye issue was not listed in the pretrial stipulation. Pursuant to Form 4.910, Florida Rules of Workers' Compensation Procedure, the parties' pretrial stipulation provided: "Any issues not specifically raised *13 in [the claims and defenses] section will be deemed waived or abandoned unless good cause is shown." Such waivers of claims or defenses not listed in the pretrial stipulation are routinely upheld. See, e.g., Oak Constr. Co. v. Jackson, 522 So.2d 1068, 1072 (Fla. 1st DCA 1988). Although the failure to object to a witness' testimony in the pretrial stipulation does not waive the objection, see Clairson Int'l v. Rose, 718 So.2d 210, 212-13 (Fla. 1st DCA 1998), because Frye objection here goes to the heart of the claimant's case and requires the JCC to conduct a separate evidentiary hearing, it is an issue that was required to be listed in the pretrial stipulation.
Second, as noted, the objections made at the depositions were not based upon Frye. Rule 1.330(d)(3)(A), Florida Rules of Civil Procedure, provides:
(A) Objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition unless the ground of the objection is one that might have been obviated or removed if presented at that time. (emphasis added).
Here, if U.S. Sugar had made an express Frye objection at the depositions, it might have obviated the necessity for a Frye objection at or prior to the merits hearing. Thus, we conclude that U.S. Sugar was required to make a specific Frye objection at the deposition. See Clairson Int'l, 718 So.2d at 213.
Our rationale for concluding that a party who seeks to raise a Frye objection in a workers' compensation proceeding must do so in the pretrial stipulation and at the deposition is based upon the nature of the trial procedure in a worker's compensation proceeding. In the present case, as in many workers' compensation proceedings, the claimant's expert testimony was presented by deposition. At the time of the depositions, neither claimant nor the expert witnesses were on notice that a Frye test was sought as to the admissibility of the expert testimony. Thus, neither claimant's counsel nor the witnesses knew to have available texts, scientific literature, or studies which would support a conclusion that the scientific principles on which their testimony was based is generally accepted in the relevant scientific community. Nevertheless, as noted above, when cross-examined, several of the expert witnesses were able to refer to scientific texts available in their offices as demonstrating such general acceptance.
Further, while U.S. Sugar raised its Frye objection before the JCC admitted the depositions and reports of claimant's physicians and experts, given the depositional nature of testimony in workers' compensation proceedings, this manner of raising a Frye objection did not provide the opportunity for the JCC to conduct a separate evidentiary Frye hearing. See, e.g., Berry v. CSX Transp., Inc., 709 So.2d 552, 555 (Fla. 1st DCA 1998).

The Frye Reliability Standard
To be admissible in Florida courts, an expert's opinion relating to matters involving novel scientific evidence[10] must be based upon scientific methods and principles that are generally accepted in *14 the relevant scientific community, a test first announced in Frye, 293 F. at 1014. See Hadden v. State, 690 So.2d 573, 576 (Fla.1997); Berry, 709 So.2d at 555-57. "[I]t is not necessary for the expert's opinion to be generally accepted as well." Berry, 709 So.2d at 567.
The Florida Supreme Court discussed the rationale for using the Frye standard in Stokes v. State, 548 So.2d 188, 193-94 (Fla.1989), as follows:
The underlying theory for this rule [Frye] is that a courtroom is not a laboratory, and as such it is not the place to conduct scientific experiments. If the scientific community considers a procedure or process unreliable for its own purposes, then the procedure must be considered less reliable for courtroom use.
Further, in Hadden, 690 So.2d at 578, the court explained the importance of the Frye standard in assuring the reliability of evidence:
[W]e firmly hold to the principle that it is the function of the court to not permit cases to be resolved on the basis of evidence for which a predicate of reliability has not been established. Reliability is fundamental to issues involved in the admissibility of evidence. It is this fundamental concept which similarly forms the rules dealing with the admissibility of hearsay evidence.... Novel scientific evidence must also be shown to be reliable on some basis other than simply that it is the opinion of the witness who seeks to offer the opinion.
The burden is on the proponent of the evidence to establish by a preponderance of the evidence the general acceptance of the underlying scientific principles and methodology. See Murray v. State, 692 So.2d 157, 161 (Fla.1997); E.I. du Pont de Nemours & Co. v. Castello, 748 So.2d 1108, 1114 (Fla. 3d DCA 2000). In Ramirez v. State, 651 So.2d 1164, 1167 (Fla.1995), the court set forth a four-step process for applying Frye:
First, the trial judge must determine whether such expert testimony will assist the jury in understanding the evidence or in determining a fact in issue.... Second, the trial judge must decide whether the expert's testimony is based on a scientific principle or discovery that is "sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923) ... The third step in the process is for the trial judge to determine whether a particular witness is qualified as an expert to present opinion testimony on the subject in issue.... Fourth, the judge may then allow the expert to render an opinion on the subject of his or her expertise, and it is then up to the jury to determine the credibility of the expert's opinion, which it may either accept or reject....
Determining general acceptance requires a court to evaluate both the quality and quantity of the literature and other evidence supporting the principle or technique. As the court has explained:
It is clear that scientific unanimity is not a precondition to a finding of general acceptance in the scientific community. Instead, general acceptance in the scientific community can be established if use of the technique is supported by a clear majority of the members of that community. Of course, the trial courts, in determining the general acceptance issue, must consider the quality, as well as quantity, of the evidence supporting or opposing a new scientific technique. Mere numerical majority support or opposition by persons minimally qualified to state an authoritative opinion is of little value. Therefore, while a "nose *15 count" is not alone sufficient to establish general acceptance in the scientific community, such acceptance likewise need not be predicated upon a unanimous view.
Brim v. State, 695 So.2d 268, 272 (Fla.1997)(quotations and citations omitted). In applying the Frye standard, however, the judge is not required to make a separate decision concerning the actual validity of the science supporting an expert opinion. As the Second District has stated:
Unlike the Daubert standard, the Frye standard does not call upon the trial judge to read the scientific literature to understand or access the scientific reliability or validity of a principle or procedure. The trial judge reviews this literature merely to determine whether there is quantitative and qualitative acceptance of the science. The trial judge is determining legal reliability, as a threshold test of legal relevance, by judgingas an objective outsiderthe level of acceptance that a principle or procedure has achieved within a scientific community. Thus, although the judge must develop at least a solid, layperson's understanding of the science, she is not expect to perform the superhuman task of transforming herself into an expert within the community. She is merely to position herself to determine the level of agreement or dissension within it.
Brim v. State, 779 So.2d 427, 435 (Fla. 2d DCA 2000) (citations and footnotes omitted).[11]
Finally, our standard for review of a Frye issue is de novo. Brim, 695 So.2d at 275; Hadden, 690 So.2d at 579; Berry, 709 So.2d at 557. Our de novo review of the Frye issue in these cases includes an examination of three methods of proof: (1) expert testimony, (2) scientific and legal writings, and (3) judicial opinions. Berry, 709 So.2d at 557; Flanagan v. State, 586 So.2d 1085, 1112 (Fla. 1st DCA 1991)(Ervin, J., concurring and dissenting).
We share Judge Altenbernd's concerns with an appellate court undertaking a de novo review not only based upon the scientific literature considered by the lower court or submitted by the parties on appeal, but also based upon literature outside of the record. See Brim, 779 So.2d at 435 ("[B]oth due process and the limited technical competence of the judiciary require that this review take place with certain safeguards that we have not yet provided."). Nevertheless, we read the Florida Supreme Court's opinion in Brim v. State, 695 So.2d 268, 274 (Fla.1997), as requiring such an undertaking for this court to reach a de novo determination of whether there is general acceptance within the relevant scientific community of the novel science before us. Further, the issue of general acceptance is to be made as of the time of appeal, rather than the trial. See Hadden, 690 So.2d at 579; E.I. du Pont, 748 So.2d at 1115.

Judicial Notice
Henson argues that the science here is not new and novel and that, accordingly, no Frye test is required. It is true that a Frye test is applied only to novel scientific evidence; that is, evidence in the "twilight zone" of science which is "between the experimental and demonstrable stages." Frye, 293 F. at 1014. Once the evidential force of the scientific theory, methodology, or technique has emerged *16 from the twilight zone, courts may take judicial notice of its uncontroverted validity. See, e.g., Hayes v. State, 660 So.2d 257 (Fla.1995)(courts may take judicial notice on some aspects of DNA; but correcting for band shifting is not generally accepted citing a National Academy of Science Report); Daubert, 509 U.S. at 593 n. 11, 113 S.Ct. 2786 ("theories that are so firmly established as to have attained the status of scientific law, such as the law of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201."); accord Williams v. State, 710 So.2d 24, 32 (Fla. 3d DCA), rev. denied, 725 So.2d 1111 (Fla.1998)("use of HGN test to establish the presence of alcohol has already gained general acceptance in the scientific community and has satisfied the requirements of Frye. Thus, under the circumstances of this case, Frye is inapplicable."); compare State v. Doriguzzi, 334 N.J.Super. 530, 760 A.2d 336 (App.Div. 2000)(HGN is a scientific test which must meet Frye standard of admissibility).
Nonetheless, courts rarely take judicial notice of a scientific theory or scientific technique. See Paul C. Giannelli & Edward J. Imwinkelried, Scientific Evidence § 1.5 (3d ed.1999)("a novel scientific technique is rarely so well established that a court would take judicial notice of its validity the first time evidence derived from the technique is offered at trial."); Erin K.L. Mahaney, Assessing the Fitness of Novel Scientific Evidence in the Post-Daubert Era: Pesticide Exposure Cases as a Paradigm for Determining Admissibility, 26 Envtl. L. 1161, 1176 (1996) (Mahaney) ("theories linking pesticide exposure to latent disease are not so well established as to warrant judicial notice or scientific unanimity."). The reason for this rarity is the concern that judicial notice can be a means of manipulating Frye by allowing courts "to declare, a priori, some technique `novel' and others not." U.S. v. Downing, 753 F.2d 1224, 1233 n. 11 (3d Cir.1985).
With these admonitions in mind, and after examining scientific literature, legal writings, judicial opinions, and the expert testimony introduced below to determine whether scientific opinion on the toxic effect of chronic exposure to these pesticides is uncontroverted, we conclude that it would not be appropriate in the present case to take judicial notice of the scientific principles and methodology underlying the opinions of claimant's experts.

Frye Analysis
On appeal, U.S. Sugar argues that a de novo Frye review demonstrates the unreliability of the science upon which claimant's experts relied in rendering their causation testimony, noting, in particular, that no epidemiological studies link phrenic nerve paralysis to any level of pesticide exposure. At oral argument, U.S. Sugar correctly acknowledged that acute exposure to these pesticides is generally accepted to be neurotoxic, but refined its Frye argument, asserting that what is not generally scientifically accepted is that chronic low level exposure to pesticides can cause unilateral neurotoxicity.
Scientific Literature. We conclude that it is now generally accepted in the relevant scientific community that organophosphates are neurotoxic. See A Combined Report of the Hazard Identification Assessment Review Committee and the FQPA Safety Factor Committee, FQPA Safety Factor Recommendations for the Organophosphates, Health Effects Division, Office of Pesticide Programs, U.S. Environmental Protection Agency (August 6, 1998) ("All of the organophosphates are neurotoxic in that they may cause cholinesterase inhibition and related clinical signs, up to and including death following *17 exposure"); see also 2 Handbook of Pesticide Toxicology, ch. 16 (Wayland J. Hayes, Jr. & Edward R. Laws, Jr. eds. 1991). Further, it is generally accepted that arsenical pesticides cause peripheral neuropathy. Id. 1 Handbook of Pesticide Toxicology at 549. Finally, "peripheral neuropathy after exposure to 2,4-D has been reported." Occupational Medicine 657 (Carl Zenz, M.D., O. Bruce Dickerson, M.D., and Edward P. Horvath, Jr., M.D., eds., 3d ed.1994). Thus, we conclude that it is generally accepted in the scientific literature that the various pesticides to which claimant was exposed are neurotoxic.
We thus turn to U.S. Sugar's argument that, even if it is generally accepted that acute exposure to organophosphates can cause neurotoxicity, it is not generally accepted that chronic exposure does so as well. We do not agree that the scientific literature supports appellant's argument. In our review, we have found Casarett & Doull's, Toxicology The Basic Science of Poison (John Doull, M.D., Ph. D., Curtis D. Klaassen, Ph.D. & Mary O. Amdur, Ph.D., eds.2d ed.1980), a text relied upon by Dr. Bowsher, particularly helpful. This text provides:
Organophosphate insecticides in common use are rapidly metabolized and excreted, and subacute or chronic poisoning by virtue of accumulation of the compounds in the body does not occur. However, because several of the organophosphates produce slowly reversible inhibition of cholinesterase accumulation of this effect can occur. Signs and symptoms of poisoning that resemble those produced by a single high dose will occur when the accumulated inhibition of cholinesterase produced by smaller, repeated doses reaches a critical level. (emphasis in original).
Id. at 368. This excerpt from an acknowledged textbook in the toxicology field provides the necessary generally accepted scientific underpinning for Dr. Bowsher's opinion that chronic low level exposures to these pesticides can cause claimant's phrenic nerve paralysis. Because of this generally accepted scientific foundation, the "extrapolation" method utilized by these experts in concluding that chronic exposure to these pesticides caused claimant's condition is an acceptable scientific technique in this case. See City of Greenville v. W.R. Grace & Co., 827 F.2d 975, 980 n. 2 (4th Cir.1987)("in the absence of scientific studies concerning exposure to low levels of asbestos, one technique accepted in the scientific community for predicting the risks associated with low-level exposure is to extrapolate the risk downward from results obtained in studies involving high-level exposures."), cited with approval, Benedi v. McNeil-P.P.C., Inc., 66 F.3d 1378, 1384 (4th Cir.1995).
In addition, the lack of epidemiological studies in the record before the JCC relating to a causal link between chronic pesticide exposures and neurotoxic disease is not fatal to Henson's claim. See Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3rd Cir. 1999) (to require published studies on general causation would doom from the outset all cases in which the state of research on the specific ailment was in its early stages and create a brightline standard based not on general acceptance but on publication of peer reviewed studies); Ambrosini v. Labarraque, 101 F.3d 129, 134 (D.C.Cir.1996)(studies unnecessary where issue is particular and has not attracted significant scientific scrutiny); Ferebee v. Chevron Chem. Co., 736 F.2d 1529, 1535-36 (D.C.Cir.1984)(when basic methodology employed is sound, recovery will not be precluded "until science has had the time and resources to complete sophisticated laboratory studies of the *18 chemical."). In fact, scientists recognize that chronic health problems due to occupational exposure to pesticides are difficult to study, because most states do not "require mandatory reporting of pesticide-related illnesses, and under-reporting is likely." See Mahaney, supra, 26 Envtl. L. at 1178.[12] The literature does reflect, however, that epidemiological studies show an association between exposure to pesticides and neurotoxic disease in farm workers. See Mahaney, supra, 26 Envtl. L. at 1180-81:
[C]ohort studies exist that demonstrate an association between pesticide exposures and cholinesterase depression among farm workers. Cholinesterase, a nervous system enzyme, is essential for proper nervous system function. Organophosphate pesticides inhibit cholinesterase, which allows the uninhibited accumulation of acetylcholine and subsequent interference with neuromuscular junction. This results in rapid twitching of certain muscles and can culminate in paralysis and death due to respiratory failure. Cholinesterase depression is generally accepted as an indication of pesticide exposure.
See also Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 805 (3d Cir.1997)(explaining that "organophosphates kill insects by inhibiting the normal breakdown of acetylcholine, which functions as a neurotransmitter in several life forms, including humans"). Thus, while references to epidemiological studies are lacking in the record, we will not preclude the testimony of claimant's experts, which we find is based on sound scientific principles, as supported by widely-accepted scientific texts and other accepted scientific literature.[13]
Judicial Decisions. Judicial decisions in many jurisdictions have recognized the neurological toxicity of chronic exposures of pesticides. See Kannankeril, 128 F.3d at 809 (accepting expert's opinion that the plaintiff exhibited signs and symptoms of chronic toxicity related to the exposure to dursban "[b]ecause the toxic effects of organophosphates on humans are well recognized by the scientific community"); accord Louderback v. Orkin Exterminating Co. Inc., 26 F.Supp.2d 1298, 1303, 1306 (D.C.Kan.1998)(expert opined that organophosphate insecticides are known to induce a peripheral neuropathy as a result of an inhibition of neurotoxic esterase); Peteet v. Dow Chemical Co., 868 F.2d 1428 (5th Cir.1989)(surviving spouse, son and parents of forest service worker who contracted cancer and died after exposure to *19 2,4-D during "hack and squirt" operation recovered; claimant's expert toxicologist discussed scientific articles detailing neurological damage suffered by patients exposed to 2,4-D); Gronbeck v. Schweiker, 534 F.Supp. 642, 645 (D.C.S.D.1982)(most of the doctors who examined plaintiff agreed that the toxic exposure to 2,4-D could account for plaintiffs neurological symptoms which included blackouts, memory lapses, dizziness and temporary paralysis on his left side); Hottinger v. Trugreen Corp., 665 N.E.2d 593, 597 (Ind.App.1996)(accepting testimony that Hottinger's peripheral nerve damage had been caused by exposure to trimec 2,4-D commenting that expert's opinion was "supported by the scientific publications subjected to peer review ..."); Bloomquist v. Wapello County, 500 N.W.2d 1, 5 (Iowa 1993)(effects of dursban are well-known and ancestors of dursban were used to execute prisoners in Nazi Germany); Bennett v. Dow Chemical, 220 Mont. 117, 713 P.2d 992, 994 (1986)(plaintiff received workers' compensation for peripheral neuropathy due to exposure to the herbicide 2,4-D); Maritime Overseas Corp. v. Ellis, 886 S.W.2d 780 (Tex.App. 1994), affirmed, 971 S.W.2d 402 (Tex.1998)(seaman awarded Jones Act verdict against a shipowner arising from the delayed neurotoxic effects of exposure to the organophosphate pesticide diazinon); Farm Servs., Inc. v. Gonzales, 756 S.W.2d 747 (Tex.App.1988)(farm worker recovered in action against pilot and plane owner of crop dusting plane after he was negligently doused with methylparathion); see also T. Brett & J Potter, Risks to Human Health Associated with Exposure to Pesticides at the Time of Application and the Role of the Courts, 1 Vill. Envtl. L.J. 355, 373-74 (1990) (chlorophenoxys, including 2,4-D, may result in demyelination of nerves, the chronic effects of which include neuritis and paralysis; organophosphates can impair central nervous function; several studies of large groups of individuals provide "very convincing evidence that pesticide exposure can and does cause both acute and chronic damage to human health").
Differential Diagnosis. Claimant's physicians' relied upon differential diagnosis in reaching their opinion. As we explained in Berry, 709 So.2d at 562, n. 9 "differential diagnosis" is "a term used `to describe a process whereby medical doctors experienced in diagnostic techniques provide testimony countering other possible causes ... of the injuries at issue.'" (quoting Hines v. Consolidated Rail Corp., 926 F.2d 262, 270 n. 6 (3d Cir.1991)). It is well-settled that an expert's use of differential diagnosis to arrive at a specific causation opinion is a methodology that is generally accepted in the relevant scientific community. See Berry, 709 So.2d at 571; Heller v. Shaw Indus., 167 F.3d 146, 154 (3d Cir.1999); In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 758 (3d Cir. 1994); Westberry v. Gislaved Gummi AB, 178 F.3d 257, 262 (4th Cir.1999). Differential diagnosis is the standard scientific technique of identifying the cause of a medical problem by eliminating likely causes until the most probable one is isolated. This technique has been found to have widespread acceptance in the medical community, to have been subjected to peer review, and to not frequently lead to incorrect results. See Westberry, 178 F.3d at 262-63.[14]
*20 Despite the procedural defects in the Frye challenge here, claimant's physician-experts reviewed medical test results and claimant's history, examined the claimant, and reviewed relevant medical literature that supported the general acceptance of the scientific principles on which they relied. Claimant's physicians were able to exclude the most common cause of phrenic nerve paralysis, trauma. Further, the experts excluded claimant's diabetes as a plausible explanation, because it arose only in response to the steroids administered to treat Henson's respiratory failure. Other possible causes of claimant's condition were eliminated because claimant does not drink alcohol and his past use of cigarettes, ending in 1988, was not considered a cause of his disorder. We conclude that, even if claimant's phrenic nerve paralysis could be "idiopathic," that possibility is not sufficient to rule out the doctors' clinical determination of etiology. See Cella v. U.S., 998 F.2d 418, 425 (7th Cir.1993).
U.S. Sugar's expert witnesses disagreed with claimant's witnesses on causation, but not one of appellant's experts testified that organophosphate compounds are not neurotoxic. Instead, their testimony primarily centered around whether the claimant exhibited classic signs of polyneuropathy dysesthesias of the feet and uniform atrophied muscles of the hands and limbs, the lack of literature causally relating pesticide exposure to phrenic nerve paralysis, and, finally, whether nerve damage can be unilateral or whether it must be systemic over the whole body. We note, however, that focal or one-sided neuropathies, although unusual, are not ruled out by the scientific literature. See generally Neil L. Rosenberg, M.D., Occupational and Environmental Neurology 220 (1995); Goldfrank, Flomenbaum, Lewin, Halland, and Hoffman, Goldfrank's Toxilogic Emergencies 322 (6th Ed.).
As Henson forcefully argues, it is generally accepted in scientific literature that chronic pesticide exposure can cause peripheral nerve paralysis; and U.S. Sugar does not point to an alternative diagnosis which the claimant's experts failed to consider, see Kannankeril, 128 F.3d at 808, and does not disclose a body of contrary evidence establishing that pesticides cannot cause phrenic nerve paralysis or that the phrenic nerve should be considered fundamentally different from other peripheral nerves. See Ambrosini, 101 F.3d at 139.
In summary, we agree with the JCC that claimant's causation expert testimony was based upon scientific principles generally accepted in the relevant scientific community. Those generally accepted principles are not required to be as narrow as the claimant's precise condition. The role of the expert witness is to apply the generally accepted principles to the facts relating to the claimant's condition. Murray, 692 So.2d at 161. As we have previously explained:
The court ... must assure itself that the opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation.... [I]t is important to emphasize that the weight to be given to stated scientific theories, and the resolution of legitimate but competing scientific views, are matters appropriately entrusted to the trier of fact.
Berry, 709 So.2d at 569 n. 14 (quoting McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn.1997), cert. denied, 524 U.S. 915, 118 S.Ct. 2296, 141 L.Ed.2d 157 (1998)). Thus, we conclude that the Frye standards were met and that the record contains competent substantial evidence to support the JCC's finding that to a reasonable degree of medical certainty Henson's disability was caused by his exposure *21 to pesticides during his employment.
AFFIRMED as to all issues raised; question certified.
LAWRENCE and DAVIS, JJ., concur.

OPINION ON REHEARING
VAN NORTWICK, J.
Appellant, United States Sugar Corporation (U.S.Sugar), has filed a motion for rehearing and rehearing en banc with respect to our opinion entered in this appeal on December 29, 2000. We deny appellant's motion. We address certain of the issues raised in appellant's motion in an attempt to clarify our opinion.
In its motion, U.S. Sugar, argues that, when this court determined that Frye applied to workers' compensation proceedings, the court was required to remand the case to the Judge of Compensation Claims (JCC) for the necessary evidentiary hearing. As support for this proposition, appellant apparently relies on this court's statement that a "Frye objection ... goes to the heart of the claimant's case and requires the JCC to conduct a separate evidentiary hearing." United States Sugar Corp. v. Henson, 787 So.2d 3 (Fla. 1st DCA 2000). To the extent that this language suggests that a separate evidentiary hearing is always required when a Frye objection is made, our language is too broad.
While a separate evidentiary hearing is the usual practice, it is not mandatory. The four-step process for applying Frye set forth by the supreme court in Ramirez v. State, 651 So.2d 1164, 1167 (Fla.1995), does not mandate a separate evidentiary hearing. Moreover, we note that appellant at no time requested the JCC to conduct an evidentiary hearing not when appellant filed its motion in limine, not when the JCC announced her intention to reserve ruling on the motion, and not when the JCC issued her final order denying appellant's Frye objection based on the evidence and authorities submitted. Finally, appellant has raised this particular argument for the first time in its motion for rehearing. As a result, even if appellant's argument had merit, we would be required to deny its motion. Absent extraordinary circumstances impacting "fundamental principles governing the administration of justice," Regan v. ITT Indus. Credit Co., 469 So.2d 1387, 1391 n. 3 (Fla. 1st DCA 1984), aff'd, 487 So.2d 1047 (Fla.1986), not present here, "[a]uthorities not cited and issues not raised in the brief or on oral argument cannot be raised for the first time on motion for rehearing." Shell Oil Co. v. Department of Revenue, 461 So.2d 959, 963 (Fla. 1st DCA 1984).
Second, appellant argues that this court utilized out-dated science in arriving at its conclusion to affirm. Specifically, appellant states that this court cited the second edition of Casarett & Doull's Toxicology The Basic Science of Poison (John Doull, M.D. Ph.D., Curtis D. Klassen, Ph.D. & Mary O. Amdur, Ph.D., eds.2d ed.1980) as supporting Dr. Bowsher's testimony when, in fact, Dr. Bowsher relied upon the third edition of that text. Further, appellant submits that the newest edition of this text, the fifth edition, makes no mention of the cumulative effects of organophosphates.
We acknowledge our error in citing to the second edition of Toxicology The Basic Science of Poison, rather than the third edition. See Casarett & Doull's Toxicology The Basic Science of Poison (Curtis D. Klassen, Ph.D., Mary O. Amdur, Ph.D. and John Doull, M.D. Ph.D., eds. 3rd ed.1986). However, this error is of no moment, because the third edition of this text contains *22 the same language as that cited from the second edition, as follows:
Organophosphate insecticides in common use are rapidly biotransformed and excreted, and subacute or chronic poisoning by virtue of accumulation of the compounds in the body does not occur. However, because several of the organophophates produce slowly reversible inhibition of cholinesterase accumulation of this effect can occur. Signs and symptoms of poisoning that resemble those produced by a single high dose will occur when the accumulated inhibition of cholinesterase produced by smaller, repeated doses reaches a critical level.
Id. at 530 (emphasis in original).
We also recognize that the above language is not included in the fifth and most recent edition of this text. However, nothing in Casarett & Doull's Toxicology The Basic Science of Poison (Curtis D. Klassen, Ph.D., Mary 0. Amdur, Ph.D. and John Doull, M.D., eds. 5th ed.1996) is inconsistent with statements in the third edition which were relied upon by Dr. Bowsher. In addition, the fifth edition does not contain any disagreement with the conclusion that chronic exposure to pesticides can produce some of the same effects as acute exposure.
Third, appellant argues that the chemical compound 2,4 D, involved in this case, has been cleared as a cause of peripheral neuropathy. We cannot agree that the weight of the scientific literature supports such a conclusion. See, e.g., Robert A. Lewis, Lewis' Dictionary of Toxicology 345 (1998) (defining 2,4 D and stating, among other things, that 2,4 D is a herbicide which in "[l]arge doses or long-continued exposure can produce severe, protracted peripheral neuropathy....").
Motion for rehearing and rehearing en banc is denied.
DAVIS and POLSTON, JJ., concur.
NOTES
[1] The Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136(u), defines a pesticide as

(1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest [defined in (t) as "insect, rodent, nematode, fungus, weed, or... other form of terrestrial or aquatic plant or animal life or virus, bacteria, or other micro-organism, (except viruses, bacteria, or other micro-organisms on or in living man or other living animals) which the Administrator declares to be a pest"] (2) any substance or mixture of substances intended for use as a plant regulator, defoliant or desiccant ...
[2] For a more detailed discussion of the application of Frye in Florida, see Berry v. CSX Transp., Inc., 709 So.2d 552, 565-571 (Fla. 1st DCA 1998).
[3] Henson testified that toward the end of his employment the spray rigs would be washed before he worked on them, if he requested it and if there was sufficient time.
[4] In its reply brief, U.S. Sugar suggests there is no evidence claimant could have been exposed to dursban/chlorpyrifos. Nevertheless, the company's spray records indicate this pesticide was sprayed. (R. 4755-4773).
[5] Certain of the pesticides to which appellant was exposed were organochlorines.
[6] With the advent of various worker protection standards in the early 1990s, U.S. Sugar began to provide special equipment for its workers and attempted to quarantine sprayed fields until the pesticides had dried. Also, it appears there has been an attempt to begin washing off the equipment before it is repaired. Claimant's supervisor testified that, in the early 1990s, he went over the MSDSs for the various pesticides with the claimant.
[7] Because the effects of atrazine are not conclusively established for purposes of this appeal, this pesticide is not considered in the causal chain. See, e.g., Schmaltz v. Norfolk & Western Railway Co., 878 F.Supp. 1119 (D.C.Ill.1995).
[8] Acetylcholine is "a compound ... that is released at many autonomic nerve endings [and] is believed to have a specific function in the transmission of the nerve impulse...." Webster's Third New International Dictionary 15 (1967).
[9] By comparison, the admissibility test used by the federal courts, first announced in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), is premised on the federal counterpart to section 90.702, rule 702, the Federal Rules of Evidence.
[10] Frye does not apply to "pure opinion testimony" based solely on the expert's personal experience and training. See Flanagan v. State, 625 So.2d 827, 828 (Fla.1993)("[P]ure opinion testimony ... does not have to meet Frye, because this type of testimony is based on the expert's personal experience and training."); Florida Power & Light Co. v. Tursi, 729 So.2d 995, 997 (Fla. 4th DCA 1999)(ophthalmologist's opinion on causation not required to meet Frye standard because opinion was not based on novel scientific evidence, but rather expert's experience and training).
[11] For a more detailed comparison of the judge's responsibilities in applying the Frye and Daubert standards, see Berry, 709 So.2d at 556, n. 4; and Brim, 779 So.2d at 434, n. 16.
[12] With the enactment of the Food Quality Protection Act of 1996 (FQPA), however, more and improved information on the risks of pesticides is becoming available. The Environmental Protection Agency has promulgated a rule which sets forth the requirements for pesticide registrants to report information about pesticide adverse effects. See James Handley, The Food Quality Protection Act + EPA's Pesticide Adverse Effects Reporting Rule = New Data and Better Pesticide Risk Decisions, 28 Envtl. L. Rep. 10241 (1998). In addition, organophosphates are now being studied as a group and new information is becoming available. FQPA Safety Factor Recommendations for the Organophosphates, supra, at 25.
[13] For example, The Official Environmental Protection Agency Handbook "Protect Yourself From Pesticides-Guide for Pesticide Handlers," included in the record, discusses the health risks of chronic exposure:

The effects of chronic exposure to low levels of pesticides can be as serious or more serious [than acute exposure]. The medical literature links pesticide to a variety of chronic diseases including cancer (particularly Leukemia), birth defects, blood disorders, sterility, abnormalities in liver and kidney function, genetic damage, and neurological, psychological and behavior effects.
(R. 1566)(emphasis supplied).
[14] We recognize that to the extent the technique is used as evidence of causation, it has been the subject of criticism. See Michael B. Kent, Jr., Daubert, Doctors and Differential Diagnosis: Treating Medical Causation Testimony as Evidence, 66 Def. Couns. J. 525 (Oct. 1999).