897 So.2d 504 (2005)
Farrah GELSTHORPE and Travis Bacus, as mother and father of Gavyn Bacus, and Farra Gelsthorpe and Travis Bacus, individually, Appellants,
v.
Lawrence I. WEINSTEIN, M.D., Paul R. Levine, M.D., Tampa Obstetrics, P.A., Galen Care, Inc., d/b/a Brandon Regional Hospital, Exodus Women's Center, Inc., and Columbia Brandon Regional Medical Center, Appellees.
No. 2D03-3826.
District Court of Appeal of Florida, Second District.
March 2, 2005.
*506 Arnold R. Ginsberg of Ginsberg & Schwartz, and Theodore H. Enfield, Miami, for Appellants.
Marlene S. Reiss and Cory W. Eichhorn of Stephens Lynn Klein LaCava Hoffman & Puya, P.A., Miami, for Appellees.
CANADY, Judge.
The plaintiffs in a medical malpractice action appeal the summary judgment in favor of the defendants which was entered after the trial court excluded the testimony of the plaintiffs' sole expert witness on the issue of causation. Because we conclude that the trial court erred in excluding the testimony of the expert, we reverse the summary judgment.

I. BACKGROUND
In their medical malpractice action the plaintiffs alleged that the infant plaintiff who was born on October 2, 1997, sustained significant brain damage at birth due to the failure of the defendant physicians to promptly perform a caesarean operation ("c-section") on his mother. The trial court granted the defendants' Frye[1] motion to bar, as not scientifically established and reliable, the testimony of the plaintiffs' only proposed witness on causation, Leon Charash, M.D., a neurologist specializing in pediatrics. The trial court granted summary judgment after the plaintiffs conceded that absent the testimony of that witness summary judgment was warranted for the defendants. On appeal the plaintiffs challenge the ruling barring the testimony by Dr. Charash on which the summary judgment was based.

A. Trial Court Order and Judgment

In this matter, after extensive oral argument, the trial court orally ruled that the testimony of Dr. Charash was not "based on a scientific principle or discovery sufficiently established to have gained general acceptance in the medical field." Neither party requested an evidentiary hearing or objected to this manner of disposition. Plaintiffs argued before the trial court that the testimony of Dr. Charash did not require Frye analysis because his opinion on causation of the child's condition was based solely on his experience and training, not on any novel scientific principle or procedure.
The court considered the deposition of Dr. Charash, a chapter of a medical text mentioned by Dr. Charash at his deposition, the deposition of David P. McGraney, M.D. (another plaintiffs' expert medical witness), and the deposition of the injured infant's mother, as well as three short affidavits submitted by the defendants from physicians (a neuroradiologist, a pediatric neurologist, and a pediatric geneticist). *507 Each of these affidavits stated in conclusory fashion that Dr. Charash's opinions did not reflect generally accepted principles in the affiant's field of expertise.

B. The Proffered Expert Testimony

Dr. Charash testified at his deposition that he has been a physician since 1950, after graduating from Cornell Medical School. He is board certified in pediatrics, practices child neurology, and is a member of the Child Neurology Society. He has previously testified in court about 400 times as an expert witness, testifying as an expert in 10 states, including Florida, and has been deposed in approximately 400 additional cases.
Dr. Charash's deposition testimony was based on a review of medical records and a conversation with the infant's mother. He stated it was not necessary to examine the child because the child's current condition would not indicate the cause of that condition and that he accepted the findings in the medical records provided to him. In reaching his opinion, Dr. Charash did not review any medical literature. He relied on his experience practicing child neurology for forty-six years, as well as his reading of journals and texts and attendance at many seminars, roundtables, conferences, and lectures. In his career, he had treated approximately twenty children who suffered brain injury as a result of brain ischemia[2] related to cephalopelvic disproportion (CPD),[3] the alleged mechanism of the injury to the infant plaintiff, but none of the cases was exactly the same as that of the infant plaintiff. In other cases, the same mechanism of injury produced such conditions as cerebral palsy, epilepsy, and cortical blindness. On questioning as to whether any literature supported his opinion, he cited chapter 11 of the textbook Neurology of the Newborn by Joseph J. Volpe, M.D. Dr. Charash indicated at his deposition that he was aware that the chapter he cited discussed premature infants, while the infant plaintiff was a full term baby.
Dr. Charash concluded that the infant suffered brain damage as a result of ischemia during a traumatic birth caused by CPD. The brain damage was manifested by the child's rather severe mental retardation, with an IQ of less than 50. The child was unable to speak meaningfully, had severe problems with locomotion, as well as strabismus,[4] and was not toilet trained or able to feed himself.
Dr. Charash stated that the medical records indicated that the child's mother was having her first child, the mother had difficulty in labor, and ultimately a c-section was ordered based on readings from fetal heart monitoring. An expert in obstetrics was prepared to testify that the c-section was unduly delayed. Dr. Charash's testimony would have shown the adverse result to the infant arising from the delay.
Dr. Charash stated that the mechanism of the child's brain damage was a significant head compression, causing changes in cerebrovascular autoregulation which produced ischemia. Due to the failure to promptly order a c-section, the child remained too long in an inhospitable place, *508 with compression causing a reduction in blood supply to the brain. Dr. Charash testified that a traumatic delivery is a known cause of brain damage in cerebral palsy, and ischemia is a well-described mechanism producing brain damage.
Dr. Charash further testified that the child was born with a cephalhematoma,[5] a condition which usually disappears a few days after birth. In this case, however, the cephalhematoma calcified and remained for at least eight months. A cephalhematoma itself is harmless, but is often a marker of severe injury to the head. The child's head was also bruised on the right side. The bruise did not appear to have been produced by application of forceps, but by the delivery itself, indicative of a very traumatic birth in which the head of the infant was banged against the bony pelvis.
According to Dr. Charash, a very significant factor in support of his opinion on causation was the child's microcephaly.[6] The child's head size was normal at birth, and measured forty-four centimeters at four months, but the head did not grow, and was still forty-four centimeters at eighteen months. The injury at birth caused brain cells to be damaged and subsequently slowed their pattern of growth, which was a classic pattern of secondary microcephaly from birth. Such an injury would not appear on brain imaging studies because the brain did not atrophy, but just stopped growing at a normal rate.
Dr. Charash stated that the secondary microcephaly excluded a genetic cause, since genetic brain damage would have produced primary microcephaly. The child was not autistic, which is overwhelmingly genetic in origin. The child did not suffer hypoxic ischemic encephalopathy (HIE)[7] at birth because he had normal Apgar scores.[8] These normal scores did not exclude neurological damage because the ischemia affected the hemispheres, where there was little cerebrospinal fluid to buffer pressure, rather than the brainstem, where there is more such fluid. Dr. Charash stated he used items of inclusion and exclusion to arrive at his determination, a time honored method of arriving at a conclusion on causality of a condition.

C. Defendants' Affidavits

The expert affidavits submitted by the defendants stated that (1) Dr. Charash's opinion about secondary microcephaly was "not generally accepted in pediatric genetics"; (2) there was an absence of "any medical literature to support a theory that head compression can cause brain ischemia in a neonate"; and (3) "[i]t is not generally accepted in neuroradiology that brain ischemia sufficient to cause permanent damage can occur during labor and delivery, yet not be evident on subsequent brain imaging studies."

II. ANALYSIS

A. Frye Standard and Scientific Evidence

"[T]he Frye test is utilized in Florida to guarantee the reliability of new or novel scientific evidence." *509 Brim v. State, 695 So.2d 268, 271 (Fla.1997). The test requires that before such new or novel scientific evidence is admitted the trial judge must determine "that the basic underlying principles of [the] evidence have been sufficiently tested and accepted by the relevant scientific community." Id. at 272. "By definition, the Frye standard only applies when an expert attempts to render an opinion that is based upon new or novel scientific techniques." United States Sugar Corp. v. Henson, 823 So.2d 104, 109 (Fla.2002). "Evidence based on a novel scientific theory is inherently unreliable and inadmissible in a legal proceeding in Florida unless the theory has been adequately tested and accepted by the relevant scientific community." Ramirez v. State, 810 So.2d 836, 843 (Fla.2001). The analysis under the Frye standard "must focus only on the general acceptance of the scientific principles and methodologies upon which an expert relies in rendering his or her opinion." Henson, 823 So.2d at 110.
Under the Frye standard, "when the expert's opinion is based upon generally accepted scientific principles and methodology, it is not necessary that the expert's deductions based thereon... also be generally accepted." Id. at 109-10. "[O]nce the Frye test is satisfied through proof of general acceptance of the basis of an opinion, the expert's opinions are to be evaluated by the finder of fact and are properly assessed as a matter of weight, not admissibility." Id. at 110.
Under Florida law, the Frye standard is not applicable to "pure opinion testimony" which is based on an "expert's personal experience and training." Flanagan v. State, 625 So.2d 827, 828 (Fla.1993). In particular, there is a distinction between an expert's "pure opinion testimony based upon clinical experience" and testimony which "rel[ies] on conclusions based upon studies and tests." Hadden v. State, 690 So.2d 573, 580 (Fla.1997).
Expert testimony which "relies on some scientific principle or test... implies infallibility not found in pure opinion testimony." Flanagan, 625 So.2d at 828. Because of the implication of infallibility, such testimony "must meet the Frye test" in order "to ensure that the jury will not be misled by experimental scientific methods which may ultimately prove to be unsound." Id. Although pure opinion testimony is "cloaked with the credibility of the expert, [it] is analyzed by the jury as [the jury] analyzes any other personal opinion or factual testimony by a witness." Id. Since opinion testimony does not have the same aura of infallibility as does testimony which is based on a scientific principle or test, pure opinion testimony does not have the same potential for misleading the jury as does testimony based on a novel scientific methodology.[9]
*510 These general principles have been applied in determining whether expert testimony concerning the issue of causation is subject to analysis under the Frye standard. Accordingly, medical expert testimony concerning the causation of a medical condition will be considered pure opinion testimony  and thus not subject to Frye analysis  when it is based solely on the expert's training and experience. And, of course, Frye will be applied where particular expert testimony concerning the cause of a medical condition is based on a novel scientific methodology. See State Farm Mut. Auto. Ins. Co. v. Johnson, 880 So.2d 721, 723 (Fla. 2d DCA 2004) (holding that Frye was not applicable to expert opinion concerning cause of fibromyalgia where "the medical experts rendered their opinions based on their clinical experience" and the "experts did not base their opinions on a new or novel scientific test or procedure"); Cerna v. S. Fla. Bioavailability Clinic, Inc., 815 So.2d 652, 656 (Fla. 3d DCA 2002) (affirming trial court's rejection of medical expert testimony concerning causation on ground that expert's "methodologies are not generally accepted in the scientific community"); Holy Cross Hosp., Inc. v. Marrone, 816 So.2d 1113, 1121-22 (Fla. 4th DCA 2001) (holding that although "a large portion of [expert's] testimony constitutes `pure opinion'" and was not subject to Frye standard, portion of testimony relating to "staging studies, and conclusions derived therefrom" are subject to analysis under Frye); Kaelbel Wholesale, Inc. v. Soderstrom, 785 So.2d 539, 547 (Fla. 4th DCA 2001) (holding that expert testimony concerning causation of medical condition, which "was not based upon personal experience or training," would be "required to meet the Frye test"); Fla. Power & Light Co. v. Tursi, 729 So.2d 995, 997 (Fla. 4th DCA 1999) (holding that Frye was not applicable where "ophthalmologist's opinion on causation was not based on `novel scientific evidence,' but rather his experience and training") (citation omitted).
It is also established that use of the technique of "differential diagnosis" by an expert medical witness in determining causation does not raise concerns under Frye."Differential diagnosis" is "an established scientific methodology in which the expert eliminates possible causes of a medical condition to arrive at the conclusion as to the actual" cause of the condition. Henson, 823 So.2d at 106. "[T]here is no question that the differential diagnosis technique ... is generally accepted in the scientific community." Id. at 110; see also Castillo v. E.I. DuPont De Nemours & Co., 854 So.2d 1264, 1271 (Fla.2003) (holding that "differential diagnosis ... was a generally accepted method for addressing specific medical causation"); Johnson, 880 So.2d at 723 (citing Henson, 823 So.2d at 104).
Appellate review of a trial court's determinations concerning Frye issues is under a de novo standard. Castillo, 854 So.2d at 1268; see also Brim, 695 So.2d at 274 (holding that "[a]ppellate review of a Frye determination will be treated as a matter of law").

B. A Frye Hearing Was Not Warranted in this Case

Dr. Charash's testimony in this case should not have been subjected to Frye analysis because it constituted "pure opinion testimony based upon clinical experience." Hadden, 690 So.2d at 580. His testimony did not rely on any study, test, procedure, or methodology that constituted new or novel scientific evidence. On the contrary, Dr. Charash simply analyzed the medical records and through the use of differential diagnosis "eliminate[d] possible causes of [the infant plaintiff's] medical *511 condition to arrive at [his] conclusion" on the issue of causation. Henson, 823 So.2d at 106.[10]
The defendants failed to show that any element of the proposed testimony by Dr. Charash testimony was subject to Frye analysis. On appeal, on the issue of the applicability of Frye, the defendants claim that Dr. Charash relied in part on Volpe, chapter 11, but that he misstated the contents thereof. The defendants contend that if Volpe is correct, Dr. Charash's opinion is unfounded and not scientifically reliable. The defendants' argument hinges on the fact that Volpe discusses premature infants, while the infant plaintiff was not premature. Yet Dr. Charash's testimony indicates that he was aware that the chapter covered premature infants. Dr. Charash described Volpe's recognition of the general mechanism of head injury from compression that Volpe applied to premature infants. Dr. Charash applied that general mechanism of injury to the infant plaintiff. Any alleged mistake in Dr. Charash's understanding of Volpe's text does not render Dr. Charash's opinion a new or novel scientific principle that requires Frye analysis, but is simply a ground for cross-examination, particularly since Dr. Charash did not cite Volpe's work as the basis for his opinion, but only identified it when specifically asked whether any literature supported his view.
The defendants also contend on appeal that Dr. Charash's opinion should be subject to Frye analysis because it could not be based on his personal experience, since he admitted at his deposition that he had never treated a child with exactly the same condition as the subject infant. This contention is without merit. Dr. Charash testified he had treated approximately twenty children with the same injury mechanism that produced a variety of conditions, including cerebral palsy, epilepsy and blindness. It is not a requirement for expert medical testimony based on personal experience that the expert previously encountered precisely the presentation of medical conditions at issue in the case. See § 766.102(5)(a)(1), Fla. Stat. (2003) (setting forth requirements for qualifications of expert witnesses in medical malpractice actions, including requirement that specialist expert "have prior experience treating similar patients" (emphasis added)). The lack of past experience with an identical patient does not remove an expert's testimony from the realm of "pure opinion testimony" which is based on the "expert's personal experience and training." Flanagan, 625 So.2d at 828.
The defendants' approach, adopted by the trial court, erroneously treats a typical opinion on medical causation as a new principle, subject to Frye analysis, simply because some other experts disagree with it and because the challenged expert does not rely on any specific authority to support his particular opinion. The trial court adopted this approach here even though the general principle that head compression can cause brain injury to infants is *512 uncontroverted. The defendants identified only the ultimate application of this general principle to a specific set of facts as the new and novel principle that allegedly required Frye review. This overly broad application of Frye ignored that under Florida law Frye analysis is concerned with the expert's methodology and reasoning only if it is based on a novel principle or procedure and that the specific "opinion of the testifying expert need not be generally accepted." Henson, 823 So.2d at 110.
The trial court erroneously accepted conclusory affidavits by experts challenging Dr. Charash's ultimate opinion as a basis for barring his testimony. Under this incorrect use of the Frye procedure, the admission of expert testimony of any kind could successfully be challenged simply by submission of an affidavit from an expert in the same field stating in conclusory fashion that the proposed expert's specific opinion is not based on a recognized scientific principle or procedure. This would vastly expand the role of the trial courts in determining the admissibility of expert opinion testimony beyond the role established by the Florida case law.

III. CONCLUSION
For these reasons, the order barring testimony by Dr. Charash is reversed and the trial court is directed to permit testimony by Dr. Charash. The summary judgment in favor of the defendants, which was based on the exclusion of Dr. Charash's testimony, is reversed, and the matter is remanded to the trial court for further proceedings.
Reversed and remanded.
STRINGER, J., Concurs.
SALCINES, J., Concurs in result only.
NOTES
[1] Frye v. United States, 293 F. 1013 (D.C.Cir.1923).
[2] Ischemia is "[l]ocal and temporary deficiency of blood supply due to obstruction of the circulation to a part." Taber's Cyclopedic Medical Dictionary 1024 (17th ed.1993).
[3] CDP is a circumstance in which the head of the baby is too large for the pelvis of the mother.
[4] Strabismus is a "[d]isorder of eye in which optic axes cannot be directed to [the] same object." Taber's Cyclopedic Medical Dictionary at 1884.
[5] Cephalhematoma is "[a] subcutaneous swelling containing blood, often found on the head of a baby several days after birth when delivery was accompanied by use of forceps." Id. at 349.
[6] Microcephaly is "[a]bnormal smallness of head." Id. at 1214.
[7] Hypoxia is a "[d]eficiency of oxygen." Id. at 952. Encephalopathy is "[a]ny dysfunction of the brain." Id. at 636.
[8] Apgar scores are based on a "[s]ystem of scoring infant's physical condition one minute and five minutes after birth." Id. at 132-33.
[9] In People v. McDonald, 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709, 723-24 (1984), overruled on other grounds, People v. Mendoza, 23 Cal.4th 896, 98 Cal.Rptr.2d 431, 4 P.3d 265 (2000), which held that the trial court improperly excluded expert testimony on the psychological factors affecting the accuracy of eyewitness testimony, the California Supreme Court observed: "It is important to distinguish ... between expert testimony and scientific evidence. When a witness gives his personal opinion on the stand  even if he qualifies as an expert  the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible. But the opposite may be true when the evidence is produced by a machine: like many laypersons, jurors tend to ascribe an inordinately high degree of certainty to proof derived from an apparently `scientific' mechanism, instrument, or procedure. Yet the aura of infallibility that often surrounds such evidence may well conceal the fact that it remains experimental and tentative."
[10] Dr Charash's thorough discussion of a variety of possible causes of the infant's condition, elicited through the detailed deposition questioning of defendants' counsel, sharply contrasts with the wholly superficial, conclusory affidavits by defendants' experts. Dr. David P. McGraney, a board certified neurologist who was a proposed plaintiff's expert witness, was also deposed and questioned in detail. Dr. McGraney stated that injury at birth from the mechanism described by Dr. Charash was common. Dr. McGraney also testified that there was a likelihood that in addition to reduction in blood supply the newborn was subjected to moderate reduction in oxygen supply. With specific reference to the child's presentation, Dr. McGraney also excluded possible alternative causes of the child's condition suggested by defendants' counsel.