SALTER, J.
 

 Aulette Andries appeals an adverse final summary judgment on her Jones Act and maintenance and cure claims against a passenger cruise line. Ms. Andries alleged that her staphylococcus infection
 
 [1]
 
 was incorrectly treated by medical staff aboard her ship and that this resulted in the onset of an incurable kidney disease known as “immunoglobulin A nephropa-thy” (“IgA nephropathy”). The circuit court granted summary judgment because it found the plaintiffs experts’ testimony on the alleged causation too novel and investigational to be admissible.
 

 The clinical observations of those experts and scientific literature regarding an association between a staph infection and IgA nephropathy require us to apply the analysis detailed by the Supreme Court of Florida in
 
 Marsh v. Valyou,
 
 977 So.2d 543 (Fla.2007). Finding that in this case the plaintiffs medical and scientific evidence constituted a sufficient predicate for admissibility under
 
 Marsh,
 
 we reverse.
 

 I.
 
 “Pure Opinion” versus “New or Novel Scientific Evidence”
 

 Marsh
 
 distinguishes two types of expert medical/scientific opinions. When the method of formulating an expert opinion is not “new or novel,” but is instead “widely accepted” and based on established scientific principles and methodology, an expert may render “pure opinion testimony” and it may be based solely on the expert’s training and experience.
 
 Marsh,
 
 977 So.2d at 548. Such “pure opinion” testimony is the first category of expert scientific/medical evidence considered under
 
 Marsh.
 
 The fact that experts may disagree about an opinion or medical diagnosis does not transform an expert’s opinion into a “new or novel principle” in the second category of opinions, nor does that disagreement preclude or limit admissibility. Rather, the resulting “battle of the experts” creates an issue for resolution by the jury (precluding summary judgment on that issue if material to the underlying cause of action).
 

 
 *262
 
 The second category of expert scientific/medical evidence pertains to expert opinions based upon new or novel scientific tests or methodologies. To be admissible, this type of evidence must have “sufficient indicia of reliability” to satisfy the Frye
 
 [2]
 
 test.
 
 Marsh,
 
 977 So.2d at 549. Under that test, “[t]he proponent of the evidence bears the burden of establishing by a preponderance of the evidence the general acceptance of the underlying scientific principles and methodology.”
 
 Castillo v. E.I. Du Pont De Nemours & Co., Inc.,
 
 854 So.2d 1264, 1268 (Fla.2003).
 
 [3]
 

 Frye
 
 issues are reviewed de novo, with “general acceptance determined as of the time of the appeal.”
 
 Id.
 

 In
 
 Marsh,
 
 the issues were whether the court should admit expert testimony linking the trauma occurring in a car accident to the onset of fibromyalgia, and whether the testimony was “pure opinion” or subject to the
 
 Frye
 
 test. Our Supreme Court determined that the
 
 Frye
 
 test did not apply, and that even if it did, the expert testimony satisfied that test. That Court concluded that the causation testimony in that case was not new or novel:
 

 The American College of Rheumatology published classification criteria for fibro-myalgia in 1990. Marsh’s experts based their diagnoses and opinions about the cause of her fibromyalgia on a review of her medical history, clinical physical examinations, their own experience, published research, and differential diagnosis.
 

 Marsh,
 
 977 So.2d at 548 (citations and quotation omitted). The Court also concluded that Marsh’s experts did not base their opinions on' new or novel scientific tests or procedures.
 

 Marsh
 
 also reaffirmed that admissibility does not depend upon proof of scientific studies “conclusively demonstrating a causal link” or an identification of the “precise etiology” of the medical condition allegedly caused by predicate events.
 
 Id.,
 
 977 So.2d at 549.
 

 II.
 
 The Expert Testimony Regarding Staph and IgA Nephropathy
 

 We next consider the nature of the expert opinions offered by Ms. Andries in this case. Her first expert witness was a physician at the University of Miami specializing in nephrology, the treatment of kidney disease. Based on the witness’s twenty years of experience and his review of records relating to Ms. Andries’s medical care and certain laboratory studies, the physician testified that the relationship between a staph infection and IgA nephropa-thy likely occurred in Ms. Andries’ case and “is well known to all of us even from the early part of our training.” He testified that a staph infection is characterized by antigens that precipitate an immune response and the production of antibodies which are believed to accumulate in the glomeruli (essentially the filtration tubes in the kidney). In certain cases, these deposits accumulate quickly and culminate in an acute, progressive kidney disease of the kind observed in this case. Because other diseases are also associated with IgA nephropathy (including HIV infection, liver disease,- and certain allergies), this physician reviewed Ms. Andries’s medical records and history in order to rule out those conditions.
 

 
 *263
 
 A second physician and professor of medicine also opined regarding an observed, if idiosyncratic,
 
 [4]
 
 association between staph infections and IgA nephropa-thy. Applying the so-called “Bradford Hill” criteria for the establishment of causality from epidemiologic data on association of disease and environmental factors,
 
 [5]
 
 he opined that “the association of staphylococcal infection and glomerulonephritis satisfies these criteria to a sufficient degree to indicate causality.” This expert had practiced medicine for over 40 years, was a specialist in immunological kidney diseases, and had authored numerous peer-reviewed research papers on nephro-pathy and related immunologic injury to the kidney.
 

 Finally, Ms. Andries offered published Japanese
 
 [6]
 
 (and other) research studies regarding the observed incidence of IgA ne-phropathy following methicillin-resistant staph infections. Among other published articles, a 2003 journal described a case of IgA nephropathy following a patient’s staph infection apparently acquired during knee surgery. A 2004 study described a staph-related antigen as “a new candidate for the induction of IgA nephropathy,”
 
 [7]
 
 based upon studies using mice as subjects. A 2006 article documented eight cases in which staph infections were the confirmed sources of IgA buildup in the kidney.
 
 [8]
 
 A number of other medical and scientific articles described the clinically-observed correlation between staph and IgA nephropa-thy and evaluated the mechanisms that might be at work.
 

 The appellee and its experts focused their attention on the developing and in-vestigational status of
 
 causation,
 
 rather than the expert opinions that an
 
 association
 
 existed. The appellee’s experts are unquestionably qualified physicians and scientists specializing in the areas of kidney disease, related pathology, and IgA nephropathy, and they testified that “the etiology of IgA nephropathy is unknown.” As noted, however,
 
 Marsh
 
 does not require scientific literature or other proof regarding the precise etiology. The appel-lee’s experts also criticized Ms. Andries’ experts for rendering opinions that were “too specific” and that did not take into account “many other possible causes” of her nephropathy.
 

 One of the appellee’s experts is a leading physician and researcher regarding IgA nephropathy, and he is the author of a recent electronic article entitled “The Pathogenesis of IgA Nephropathy.”
 
 [9]
 
 He testified that there is no known cause for IgA nephropathy, that he considers any such studies using mice as subjects to be unreliable, and that “association studies”
 
 *264
 
 (such as some of those relied upon by Ms. Andries’ experts) are not scientific proof that a staph infection may cause IgA ne-phropathy:
 

 Q: And was there anything in the Japanese studies that would lend any credence to you to render an opinion that a staph A skin infection can cause IgA nephropathy?
 

 A: No. The only human study that they present is a study looking at kidney biopsy specimens and looking at whether a fragment of the staphylococcal bug appears in the very fine filters of the kidney. And they show that. They don’t show that the IgA molecule that is deposited in these very fine filters is there because of the staph, because of this fragment of bug. They don’t show that the IgA in the kidney has actually got anything to do with this, this fragment of the staphylococcal bacteria.
 

 Q: Okay.
 

 A: It’s what we call an association study.
 

 Q: Can you explain that to me and the court?
 

 A: So what they have done is they have associated one event with another. So — and this is how I teach association, but essentially if we were to look at say a cause for obesity and we were to look, for instance, in Europe at the number of houses that own a television, and we were to look in Africa the number of houses that own a television and then we look at the instance of obesity, we would see that the number of televisions in Europe is very high, the level of obesity is very high. The number of televisions in Africa is very low and the level of obesity in Africa is very low. You can then say that the number of televisions is associated with obesity. It doesn’t correlate or suggest that one is caused by the other, it’s simply an association. And that is the biggest drawback to this Japanese study because it is associating one event with another and there is no causality.
 

 This and other testimony merely focused again, however, on a search for causation. The appellee’s experts did not deny that staph infections are suspected of triggering IgA nephropathy in some persons. In fact, the study to identify a cause is in many ways an acknowledgment that there is some type of biological mechanism at work for staph infections
 
 and
 
 other triggering events.
 

 In this case, therefore, as in
 
 Marsh,
 
 the clinical observations (based on Ms. An-dries’ physicians’ “review of her medical history, clinical physical examinations, their own experience, published research, and differential diagnosis”
 
 [10]
 
 ) indicate a link between a staph infection and Ms. Andries’ kidney disease. Because of the general acceptance of those evaluative measures in the scientific community, her experts’ opinions are not “new or novel” within the meaning of
 
 Frye
 
 and
 
 Marsh.
 

 The experts’ disagreements on the nature of the staph-IgA nephropathy link, and the lack of certainty regarding the precise causative process, are genuine disputes that should be decided by a jury. The jurors will give appropriate weight to the experts, their qualifications, and the facts and literature relied upon by each expert in rendering his or her opinion.
 

 Marsh
 
 represents the latest effort in a continuing attempt to limit the admission of opinions based on so-called “junk science” or pseudo science. In this case, however, each condition (staph infection and IgA nephropathy) is a recognized diagnosis, and the anecdotal association be
 
 *265
 
 tween the two has been recognized to be worthy of formal and published research. The fact that the precise causation is still under investigation does not make the expert opinions in this case “new or novel” or inadmissible under the more demanding requirements of
 
 Frye.
 

 III.
 
 Conclusion
 

 The trial court studied this medical mystery diligently and patiently. The appel-lee’s experts are certainly among the leaders in researching the pertinent disease process, and their opinions seem forceful. Nonetheless, in this case qualified physicians for the appellant have expressed an opinion that there is a link between recognized medical condition X and sequela Y, those and other observations have been found worthy of further detailed scientific investigation, and the published results of such investigations have focused on the possible etiology. It is precisely this sort of disagreement that, under
 
 Marsh,
 
 amounts to a duel of competing — and admissible — pure opinions.
 

 Reversed and remanded for further proceedings.
 

 [1]
 

 . Ms. Andries alleged that she developed a boil on her right leg while an employee aboard the Royal Caribbean vessel "Explorer.” A medical doctor specializing in dermatology expressed an opinion that the infection was more likely than not a "methicillin resistant staphylococcus aureus infection.”
 

 [2]
 

 .
 
 Frye v. United States,
 
 293 F. 1013 (D.C.Cir. 1923) (holding that an early version of a polygraph machine lacked sufficient scientific acceptance and reliability to support the admission of expert testimony interpreting the results.
 

 [3]
 

 . Quoted with approval in
 
 Marsh,
 
 977 So.2d at 547.
 

 [4]
 

 . The nephropathy only develops in a fraction of the individuals exposed to a staph infection, and the reasons for differences in susceptibility are not clearly understood.
 

 [5]
 

 .
 
 See Meirell Dow Pharms., Inc. v. Havner,
 
 953 S.W.2d 706, 718 n. 2 (Tex. 1997).
 

 [6]
 

 . The expert testified that the highest incidence of IgA nephropathy occurs in Japan.
 

 [7]
 

 . S. Sharmin, Y. Shimizu, A. Hagiwara, K. Hirayama, A. Koyama, "Staphylococcus au-reus antigens induce IgA-type glomerulone-phritis in Balb/c mice,” J. Nephrology 17:504-511 (2004).
 

 [8]
 

 . A. Satoskar, G. Nadasdy, J. Plaza, D. Sed-mak, G. Shidham, L. Hebert, and T. Nadasdy, "Staphylococcus infection-associated glomer-ulonephritis mimicking IgA nephropathy,” Clin. J. Am. Soc. Nephrologists, 1:1179-1186 (2006).
 

 [9]
 

 . The article appears as part of a licensed online medical textbook, "UpToDate," constantly updated to include current world medical and scientific literature on specific medical topics.
 

 [10]
 

 .
 
 Marsh,
 
 977 So.2d at 548.