PER CURIAM.
 

 Michael Hood and his wife, Teri Hood, appeal the summary final judgment entered in this product liability action in favor of Matrixx Initiatives, Inc., Zicam, LLC (collectively referred to as “Ma-trixx”), Publix Super Markets, Inc. (Pub-lix), and Botanical Laboratories, Inc. (Botanical). We reverse the summary judgment because we find that the relevant issue — whether the Hoods’ expert, Dr. Bruce Jafek, should be allowed to testify that Mr. Hood’s use of Zicam gel caused him to lose his sense of smell — is controlled by the standards set forth in the Florida Supreme Court’s decision in
 
 Marsh v. Valyou,
 
 977 So.2d 543 (Fla.2007). Applying
 
 Marsh,
 
 we find that the trial court erred in refusing to allow Dr. Jafek to testify on the issue of causation.
 

 The present action arises out of Michael Hood’s claim that he sustained personal injuries as the result of his use of Zicam nasal gel, a homeopathic over-the-counter cold remedy that the Hoods purchased at a Publix grocery store. In particular, Mr. Hood alleged that in November of 2000, he used Zicam to prevent a possible cold. Zicam is used by squirting a gel-like substance, which contains zinc gluconate, into the nose. Mr. Hood alleged that as a result of the application of Zicam gel in his nose, he developed anosmia, otherwise known as the loss of the sense of smell.
 

 The Hoods brought this action against several defendants that were involved in the development, manufacturing, marketing, or retail sale of Zicam nasal gel— Matrixx, Publix and Botanical. Mr. Hood asserted various claims, including strict products liability, negligence, and breach of warranty. In addition, his wife, Teri, brought a claim for loss of consortium.
 

 By way of background, it is generally accepted that there are multiple possible causes of persistent loss of smell, such as upper respiratory infections, sinonasal disease, and head trauma. In an effort to prove the element of causation, the plaintiffs presented the opinion of Dr. Bruce Jafek, a professor of otolaryngology at the University of Colorado, School of Medicine. Dr. Jafek conducted an independent medical examination on Mr. Hood in December 2005. Dr. Jafek subsequently prepared a medical report which described Mr. Hood’s medical history, discussed the results of the medical examination, reviewed medical and scientific literature, and set forth Dr. Jafek’s opinions regarding the cause of Mr. Hood’s anosmia. The plaintiffs also presented excerpts of Dr.
 
 *1169
 
 Jafek’s deposition testimony in other Zi-cam cases, as well as medical case study articles regarding anosmia after the use of zinc gluconate.
 
 See
 
 Bruce W. Jafek et al.,
 
 Anosmia after Intranasal Zinc Gluconate Use,
 
 18 Am. J. Rhinol. 137 (2004); T.H. Alexander & T.M. Davidson,
 
 Intranasal Zinc and Anosmia: The Zinc-Induced Anosmia Syndrome,
 
 116 Laryngoscope (Vol. 2) 217-20 (Feb.2006).
 

 According to Dr. Jafek’s written report, Mr. Hood used Zicam because he thought he might be getting a cold. Mr. Hood squirted Zicam into each nostril, sniffed, and experienced an immediate burning sensation, lasting several hours. Soon after using Zicam, Mr. Hood noticed a loss of smell, and when it did not return, he consulted several doctors. He was evaluated with both CT and MRI testing, both of which were normal, thus excluding trauma as a possible cause of his anosmia. Dr. Jafek performed an examination of Mr. Hood’s olfactory groove, which he reports showed “apparent scarring of the mucosa (olfactory epithelium) of the olfactory cleft.... ” Having reviewed the patient data, Dr. Jafek concluded that Mr. Hood’s allergies, medications, past history, social history, family history, and other medical history were not contributing factors to his anosmia.
 

 In his report, Dr. Jafek further opined that: (1) Zicam nasal gel, when used according to the directions contained in the package, reaches the olfactory epithelium (smell tissue) in humans; (2) the active ingredient in Zicam, zinc gluconate, is toxic to the olfactory epithelium; (3) Zicam nasal gel is toxic to the olfactory epithelium in the amounts delivered with the pump; (4) Zicam toxicity to the olfactory epithelium is permanent in some cases; and (5) the acute nature and strong temporal association of Mr. Hood’s loss, accompanied by burning pain (a recognized sign of injury), strongly supports that the application of Zicam was the cause of Mr. Hood’s loss of smell, as opposed to the other “several hundred causes of loss of smell described in the literature.”
 

 One of Dr. Jafek’s foundational opinions on causation is that Zicam nasal gel, when used as directed, can reach the olfactory epithelium (i.e., tissue containing nerve cells that detect smell). Through personal observations, Dr. Jafek noted that the Zi-cam nasal pump could squirt gel into the air at a distance of four to ten feet, routinely reaching the ceiling. He further noted that Zicam gel, when pumped, travels in a straight stream, according to his personal observation. Dr. Jafek asserted that the pathway from the nasal sill (the outer opening of the nose) to the cribiform plate (the site of the olfactory epithelium) is straight in most patients, as shown in a 1930s polio study. Dr. Jafek relied upon a 1937 article entitled “The Chemical Prophylaxis for Poliomyelitis,” which studied whether the intranasal application of zinc sulfate could protect children from the polio virus.
 
 See
 
 Max M. Peet et al.,
 
 The Chemical Prophylaxis for Poliomyelitis,
 
 108 J. Am. Med. Ass’n 2184 (1937). In Dr. Jafek’s opinion, there was no visible obstruction or significant septal deviation in Mr. Hood’s nose.
 

 Another of Dr. Jafek’s foundational opinions is that zinc gluconate is toxic to the olfactory epithelium. Dr. Jafek’s conclusion in this regard is founded in large part bn polio studies of the 1930s and 40s, animal experiments, and his own protein-precipitation experiment. In the polio studies, polio researchers applied a zinc sulfate solution directly to the olfactory epithelium, attempting to prevent the entry of the polio virus. The polio studies demonstrated that zinc sulfate is toxic to the olfactory epithelium. However, the active ingredient of Zicam is zinc gluco-
 
 *1170
 
 nate. Dr. Jafek concluded that zinc gluco-nate produces analogous effects to zinc sulfate, reasoning that: (1) zinc gluconate releases zinc ions when dissolved in water, (2) zinc sulfate and zinc gluconate had similar solubility, (3) zinc sulfate does not react with water to form sulfuric acid, which indicates that it is the zinc ion (rather than sulfuric acid) causing the toxicity, (4) animal studies, in particular a study on fish, showed that it was the release of zinc ions from the zinc sulfate that is toxic to olfactory tissue, as sodium sulfate was not toxic to the olfactory tissue, (5) zinc ions are “the standard method” to produce the loss of smell in animals, and (6) Dr. Jafek’s own protein-precipitation experiment showed that zinc gluconate produces analogous effects to other zinc salts, “implying analogous pharmacodynamic mechanisms in the production of loss of smell.”
 

 Dr. Jafek further opined that zinc gluco-nate is toxic to the olfactory epithelium in the amounts delivered with the pump. Dr. Jafek based this opinion on an animal study regarding the toxicity of zinc sulfate to the olfactory epithelium in mice. Dr. Jafek’s report noted that the olfactory epithelium of a mouse is approximately the same size as that of a human. Dr. Jafek asserted that the recommended human dose of zinc gluconate in Zicam is 17 ½ times the LOEL (least observable effect level) for olfactory damage in mice.
 

 The defendants moved to exclude the testimony of Plaintiffs’ sole causation expert, Dr. Jafek, and for summary judgment. The defendants contended that Dr. Jafek’s expert opinion testimony that Zi-cam nasal gel reached Mr. Hood’s olfactory epithelium failed to meet the standards set forth in
 
 Frye, v. United States,
 
 293 F. 1013 (D.C.Cir.1923), because this opinion had not been generally accepted by the relevant scientific community, and further contended that his opinion concerning the toxicity of zinc gluconate was new and novel and not based on scientific principles.
 

 The Hoods opposed the defendants’ motion, arguing that Dr. Jafek’s medical opinion, based on a “differential diagnosis,” was a “pure opinion” that was not subject to
 
 Frye
 
 and was admissible under
 
 Marsh
 
 Second, they argued that even if
 
 Frye
 
 applied, Dr. Jafek’s opinion satisfied
 
 Frye,
 
 as it was based upon a differential diagnosis as well as studies dating back to the 1930s linking zinc to anosmia.
 

 At an October 2008 hearing on defendants’ motion to exclude Dr. Jafek’s testimony, the defendants presented multiple expert reports and studies in support of their motion to exclude the expert report and testimony of Dr. Jafek.
 
 [1]
 
 The defendants also relied upon a number of federal opinions excluding Dr. Jafek’s causation testimony as unreliable under the federal standard set forth in
 
 Daubert v. Merrell Dow Pharmaceuticals, Inc.,
 
 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
 
 See, e.g., Polski v. Quigley Corp.,
 
 538 F.3d 836, 841 (8th Cir.2008) (affirming the exclusion of Dr. Jafek’s opinions on causation because they all “relied on his untested opinion that Cold-Eeze, when used as directed, comes into direct contact with the olfactory epithelium”);
 
 Lusch v. Matrixx Initiatives, Inc.,
 
 74 Fed.R.Evid. Serv. 880 (D.Or.2007) (excluding Dr. Jafek’s causation opinion and finding that there is no reasonable scientific evidence supporting
 
 *1171
 
 his opinions that Zicam actually reaches the olfactory epithelium, that Zicam is toxic to the olfactory epithelial tissue, or that Zicam is delivered in a dose sufficient to permanently damage olfactory epithelial tissue);
 
 O’Hanlon v. Matrixx Initiatives, Inc.,
 
 2007 WL 2446496 (C.D.Cal.2007) (finding, among other faults, that Dr. Jafek merely extrapolated from an accepted premise, that zinc ions are toxic to the olfactory epithelium, to an unfounded conclusion, that zinc ions contained in a dose of Zicam are toxic to the olfactory epithelium);
 
 Benkwith v. Matrixx Initiatives, Inc.,
 
 467 F.Supp.2d 1316, 1332 (M.D.Ala.2006) (excluding Dr. Jafek’s causation opinions because “he attempts to use animal studies without support for extrapolation to humans, cites ‘epidemiologic studies’ that fail to follow the fundamentals of epidemiology, makes unsupported analogies between different chemical substances, performs unsound experiments, draws impermissible conclusions from other scientists’ articles and experiments, and relies on irrelevant and unreliable data”);
 
 Sutherland v. Matrixx Initiatives, Inc.,
 
 2006 WL 6617000 (N.D.Ala.2006) (concluding that “the methods and procedures [Dr. Jafek] employed are not sufficiently reliable under
 
 Daubert
 
 and Rule 702 to allow him to share his opinions with a jury”);
 
 Hans v. Matrixx Initiatives, Inc.,
 
 2006 WL 5229820 (W.D.Ky.2006) (same).
 
 [2]
 

 The defendants also presented testimony from Dr. Richard Dalby,-Ph.D., a professor of pharmaceutical sciences and a researcher in the field of nasal and respiratory drug delivery. Dr. Dalby testified to the various methods used by scientists to investigate nasal drug delivery, including gamma scintigraphy (a technique whereby the dosage delivery can be non-invasively imaged), dye-tracking studies in living humans, studies on “model noses,” and mathematical models based on particle dynamics to make predictions about where the fluid will travel. Noting that the user is instructed not to sniff after applying Zicam gel, Dr. Dalby testified that if an individual follows the instructions “exactly as they are written,” it was “extraordinarily certain” that the gel would be deposited in the lower nasal cavity, below the smell tissue.
 

 Dr. Dalby criticized the methodologies employed by Dr. Jafek, explaining that there is no correlation between open air spray characteristics and intranasal deposition patterns. Dr. Dalby also criticized the methodology of a “cadaver experiment” performed by Dr. Jafek,
 
 [3]
 
 in which Dr. Jafek added blue dye to Zicam nasal gel and sprayed it into the nasal cavity of a cadaver to demonstrate that the Zicam can reach the olfactory epithelium. Dr. Dalby testified that “this type of experiment with a cadaver” was not a reliable or generally accepted method for testing whether a nasal solution will reach the olfactory region in a living human. Dr. Dalby was unaware of anyone, other than Dr. Jafek, who used this method to investigate nasal drug deposit patterns. Dr. Dalby also criticized
 
 *1172
 
 Dr. Jafek’s use of an “incredibly deep insertion” during Ms cadaver experiment.
 

 The trial court granted the motion to exclude Dr. Jafek’s general causation opinion, ruling that it did not meet the standards for the admissibility of expert scientific testimony under
 
 Frye.
 
 The trial court concluded that “Plaintiffs have failed to carry their burden of demonstrating that the methods and techmques upon which Dr. Jafek relies to form his causation opinion have been shown to [be] reliable through general acceptance in the scientific community as required by
 
 Frye.”
 
 The trial court’s evidentiary ruling excluded the plaintiffs’ sole causation expert and, therefore, the trial court subsequently granted Defendants’ motion for summary judgment.
 

 The plaintiffs contend on appeal that the trial court erred in relying on
 
 Frye
 
 to exclude Dr. Jafek’s testimony, arguing that Dr. Jafek’s testimony is admissible pursuant to the standards articulated by the Florida Supreme Court in
 
 Marsh.
 
 The plaintiffs argue that under
 
 Marsh,
 
 Dr. Jafek’s expert medical causation testimony is not “new or novel” and is not subject to the
 
 Frye
 
 test. The plaintiffs point out that Dr. Jafek’s opinion was based upon his clinical experience, his review of Mr. Hood’s medical history, a physical examination, and a review of scientific literature, which documents a link between zinc ions and damage to the olfactory epithelium. Alternatively, Plaintiffs argue that even if
 
 Frye
 
 applied, Dr. Jafek’s opinion satisfied
 
 Frye,
 
 as it was based upon a differential diagnosis, as well as studies linking zinc to anosmia dating back to the 1930s.
 

 Defendants contend that the trial court properly applied
 
 Frye
 
 to exclude Dr. Jaf-ek’s opinions on causation because the methods used by Dr. Jafek to reach his opinions as to general causation
 
 [4]
 
 are neither reliable nor generally accepted in the scientific community. In particular, the defendants maintain that Dr. Jafek failed to employ generally accepted scientific methods in reaching his opinions that (1) zinc ions reach the smell tissue under conditions of ordinary use of Zicam, (2) the properties of zinc gluconate are chemically analogous to the properties of zinc sulfate, and (3) the amount of Zicam administered by the pump is sufficient to cause the anosmia (i.e., the dose-response relationship). Finally, Defendants contend that Dr. Jafek’s testimony is not “pure opinion” testimony immune from
 
 Frye
 
 scrutiny.
 

 The Florida Supreme Court continues to adhere to the
 
 Frye
 
 test as the proper standard for admitting novel scientific evidence in Florida.
 
 See Hadden v. State,
 
 690 So.2d 573, 578 (Fla.1997) (“Our specific adoption of that test after the enactment of the evidence code manifests our intent to use the
 
 Frye
 
 test as the proper standard for admitting novel scientific evidence in Florida, even though the
 
 Frye
 
 test is not set forth in the evidence code.”);
 
 Flanagan v. State,
 
 625 So.2d 827, 829 n. 2 (Fla.1993) (“Florida continues to adhere to the
 
 Frye
 
 test for the admissibility of scientific opinions.”). Under
 
 Frye,
 
 the proponent of the expert evidence “bears the burden of establishing by a preponderance
 
 *1173
 
 of the evidence the general acceptance of the underlying scientific principles and methodology.”
 
 Castillo v. E.I. Du Pont De Nemours & Co.,
 
 854 So.2d 1264, 1268 (Fla.2003). “This test requires that the scientific principles undergirding this evidence be found by the trial court to be generally accepted by the relevant members of its particular field.”
 
 Hadden,
 
 690 So.2d at 576. Nonetheless, “the
 
 Frye
 
 standard only applies when an expert attempts to render an opinion that is based upon new or novel scientific techniques.”
 
 U.S. Sugar Corp. v. Henson,
 
 823 So.2d 104, 109 (Fla.2002). Therefore,
 
 Frye
 
 is inapplicable to the “vast majority” of cases.
 
 Marsh,
 
 977 So.2d at 547.
 

 In
 
 Marsh,
 
 the Florida Supreme Court explained the distinction between “pure opinion” testimony and novel scientific testimony in considering whether
 
 Frye
 
 applies to medical expert testimony causally linking trauma to fibromyalgia.
 
 Id.
 
 at 544.
 

 “Pure opinion” testimony does not have to meet
 
 Frye
 
 because this type of testimony is based on the expert’s personal experience and training.
 
 Flanagan,
 
 625 So.2d at 828. This court has explained that “pure opinion” testimony “refers to expert opinion developed from inductive reasoning based on the experts’ own experience, observation, or research, whereas the
 
 Frye
 
 test applies when an expert witness reaches a conclusion by deduction, from applying new and novel scientific principle, formula, or procedure developed by others.”
 
 See Holy Cross Hosp., Inc. v. Marrone,
 
 816 So.2d 1113, 1117 (Fla. 4th DCA 2001). Thus, “medical expert testimony concerning the causation of a medical condition will be considered pure opinion testimony — and thus not subject to
 
 Frye
 
 analysis — when it is based solely on the expert’s training and experience.”
 
 Gelsthorpe v. Weinstein,
 
 897 So.2d 504, 510 (Fla. 2d DCA 2005).
 
 “Frye
 
 will be applied where particular expert testimony concerning the cause of a medical condition is based on a novel scientific methodology.”
 
 Id.
 

 Our supreme court, in
 
 Marsh,
 
 held that
 
 Frye
 
 does not apply to expert testimony causally linking trauma to fibromyalgia and that “even if the testimony had to satisfy
 
 Frye,
 
 it does.”
 
 Marsh,
 
 977 So.2d at 546. First, the court concluded that the expert medical causation testimony was not “new or novel,” explaining that Marsh’s experts had based their opinions about the cause of her fibromyalgia “on a review of her medical history, clinical physical examinations, their own experience, published research, and differential diagnosis.”
 
 Id.
 
 at 548. The court reasoned that because testimony causally linking trauma to fibromyalgia is based on the experts’ experience and training, it is “pure opinion,” admissible without having to satisfy
 
 Frye. Id.
 
 at 549. The court then elaborated:
 

 Marsh’s experts did not base their opinions on new or novel scientific tests or procedures, and Respondents did not challenge the patient history, examination methods, clinical practices, or other methodologies upon which they did rely. In fact, Respondents could not challenge the underlying methodology, as we have previously held that differential diagnosis is a generally accepted method for determining specific causation. Instead, Respondents challenged the experts’
 
 conclusions
 
 that trauma caused Marsh’s fibromyalgia.
 

 Id.
 
 (citations omitted) (emphasis in original).
 

 The court in
 
 Marsh
 
 also concluded that even if subject to
 
 Frye,
 
 the testimony linking trauma to fibromyalgia satisfies the
 
 Frye
 
 test. Noting that there are numerous published articles and studies which recognize an “association” between trauma
 
 *1174
 
 and fibromyalgia, the court reaffirmed that a “lack of studies conclusively demonstrating a causal link between trauma and fi-bromyalgia and calls for further research do not preclude admission of the testimony.”
 
 Id.
 
 at 550. The court held that
 
 Frye
 
 does not require unanimity, and Marsh had sufficiently demonstrated the reliability of her experts’ testimony, even though “the precise etiology of fibromyalgia” was not fully understood.
 
 Id.
 

 The Third District recently applied the analysis of
 
 Marsh
 
 in
 
 Andries v. Royal Caribbean Cruises, Ltd.,
 
 12 So.3d 260 (Fla. 3d DCA 2009). In
 
 Andii.es,
 
 the issue was whether the trial court properly excluded the plaintiffs experts’ testimony that her staphylococcus infection caused an incurable kidney disease known as “IgA nephro-pathy.” One of the plaintiffs experts testified that the staph infection likely caused the plaintiffs IgA nephropathy, relying on a differential diagnosis to rule out other conditions associated with IgA nephropa-thy.
 
 Id.
 
 at 262. Another of the plaintiffs experts testified to an observed association between staph infections and IgA nephro-pathy.
 
 Id.
 
 at 263. By contrast, a defense expert testified that “the etiology of IgA nephropathy is unknown” and criticized the studies relied upon by the plaintiffs experts on the basis that the studies were either unreliable or were not scientific proof that a staph infection may cause IgA nephropathy.
 
 Id.
 
 at 263-64.
 

 On appeal, the Third District reversed the trial court’s exclusion of the plaintiffs experts’ testimony, finding that the plaintiffs medical and scientific evidence constituted a sufficient predicate for admissibility under
 
 Marsh.
 
 The Third District explained:
 

 In this case, therefore, as in
 
 Marsh,
 
 the clinical observations (based on Ms. Andries’ physicians’ “review of her medical history, clinical physical examinations, their own experience, published research,-and differential diagnosis”) indicate a link between a staph infection and Ms. Andries’ kidney disease. Because of the general acceptance of those evaluative measures in the scientific community, her experts’ opinions are not “new or novel” within the meaning of
 
 Frye
 
 and
 
 Marsh.
 

 The experts’ disagreements on the nature of the staph-IgA nephropathy link, and the lack of certainty regarding the precise causative process, are genuine disputes that should be decided by a jury. The jurors will give appropriate weight to the experts, their qualifications, and the facts and literature relied upon by each expert in rendering his or her opinion.
 

 Marsh
 
 represents the latest effort in a continuing attempt to limit the admission of opinions based on so-called “junk science” or pseudo science. In this case, however, each condition (staph infection and IgA nephropathy) is a recognized diagnosis, and the anecdotal association between the two has been recognized to be worthy of formal and published research. The fact that the precise causation is still under investigation does not make the expert opinions in this case “new or novel” or inadmissible under the more demanding requirements of
 
 Frye.
 

 [[Image here]]
 

 [I]n this case qualified physicians for the appellant have expressed an opinion that there is a link between recognized medical condition X and sequela Y, those and other observations have been found worthy of further detailed scientific investigation, and the published results of such investigations have focused on the possible etiology. It is precisely this sort of disagreement that, under
 
 Marsh,
 
 
 *1175
 
 amounts to a duel of competing — and admissible — pure opinions.
 

 Id.
 
 at 264-65 (footnote omitted).
 

 While we recognize the federal courts’ uniform refusal to admit Dr. Jaf-ek’s testimony, we are compelled to find that Dr. Jafek’s opinion is admissible in Florida under
 
 Marsh.
 
 As explained in
 
 Marsh,
 
 it is unnecessary for a plaintiff to conclusively demonstrate a causal link or to identify the “precise etiology” of the medical condition allegedly caused by the substance or predicate event. Accordingly,
 
 Marsh
 
 presents a “battle-of-the-experts” approach to the admissibility of expert testimony, designed to prevent trial judges from usurping “the jury’s role in evaluating the credibility of experts and choosing between legitimate but conflicting scientific views.”
 
 Marsh,
 
 977 So.2d at 549. Our understanding of
 
 Marsh
 
 is that where the scientific literature recognizes an association or possible etiology between a medical condition and a predicate event, a medical expert may render a medical causation opinion based upon a differential diagnosis.
 

 Here, as in
 
 Marsh
 
 and
 
 Andries,
 
 Dr. Jafek’s causation opinion relied upon a review of Mr. Hood’s medical history, a clinical examination, Dr. Jafek’s personal experience regarding nasal anatomy, published research, and a differential diagnosis. Dr. Jafek opined that Zicam was the cause of Mr. Hood’s smell loss, ruling out other causes based on the strong temporal association and the acute nature of the loss of smell following the application of the Zi-cam. The defendants did not specifically challenge Dr. Jafek’s differential diagnosis below, as their motion challenged only Dr. Jafek’s general causation testimony that Zicam can cause anosmia.
 

 Defendants attempt to distinguish
 
 Marsh
 
 by arguing that Dr. Jafek’s causation opinion is not based solely on his experience and training, but is rather subject to
 
 Frye
 
 because it was based in part on experiments and studies. However, in both
 
 Marsh
 
 and
 
 Andries,
 
 the medical experts relied upon published articles and studies regarding a possible association between the predicate event and the disease, yet in both of those cases, the medical causation opinions were deemed “pure opinion.” One possible distinction between this case and
 
 Marsh
 
 is that here, Dr. Jafek did personally conduct experimentation in support of his general causation theory, including a cadaver experiment regarding nasal distribution of Zicam, as mentioned in many of the federal cases. However, the cadaver experiment was not specifically mentioned in Dr. Jafek’s report, and the plaintiffs specifically represented that they were not relying upon the cadaver experiment as support for Dr. Jafek’s opinion that Mr. Hood has anosmia secondary to Zicam usage. To the extent that Dr. Jafek relied upon “new and novel” experiments that he personally conducted regarding Zi-cam, such as the cadaver experiment, evidence regarding such experiments is not admissible as “pure opinion.” Dr. Jafek’s remaining opinions, however, are admissible as “pure opinion” testimony. Furthermore, Dr. Jafek’s testimony regarding the scientific literature he relied upon is also admissible.
 
 See Andries,
 
 12 So.3d at 264 (“The jurors will give appropriate weight to the experts, their qualifications, and the facts and literature relied upon by each expert in rendering his or her opinion.”).
 

 Under the reasoning of
 
 Marsh,
 
 the fact that precise causation is still under investigation does not make Dr. Jafek’s expert opinion causally linking Mr. Hood’s use of Zicam nasal gel to his anosmia “new or novel” or inadmissible under the more demanding requirements of
 
 Frye.
 
 With the exception of any “new or novel” scientific methodology that Dr. Jafek relied
 
 *1176
 
 upon to form a causation opinion (i.e., the cadaver experiment), Dr. Jafek may testify to any “pure opinion” he formed based upon his review of Mr. Hood’s medical history, his clinical physical examinations, his personal experience, published research, and differential diagnosis.
 
 See Marsh,
 
 977 So.2d at 548.
 

 Reversed and remanded for further proceedings.
 

 GROSS, C.J., CIKLIN, J., and KEYSER, JANIS BRUSTARES, Associate Judge, concur.
 

 [1]
 

 . For example, Defendants presented evidence of multiple studies (funded by Matrixx) investigating Zicam, including the initial efficacy studies (which did not specifically set out to study possible links to anosmia), nasal distribution studies, and an animal toxicology study. Without delving into specifics, the results of these studies were inconsistent with Dr. Jafek’s conclusions.
 

 [2]
 

 . Additionally, subsequent to the hearing on the defendants’ motion to exclude, the federal district court for the Middle District of Florida excluded medical expert opinions on causation in Zicam litigation, finding that those opinions lacked "reliable factual and methodological foundations” because the doctors "lack the specialized knowledge and training needed to properly opine on the toxicity of Zicam and zinc gluconate and have not made up for these shortcomings with adequate investigation or experimentation.”
 
 Evans v. Matrixx Initiatives, Inc.,
 
 2009 WL 2914252 (M.D.Fla.2009).
 

 [3]
 

 . Plaintiffs’ counsel asserted that Dr. Jafek was not relying on the cadaver experiment as the basis for his opinion that Mr. Hood has anosmia secondary to Zicam usage.
 

 [4]
 

 . The question of general causation focuses on whether a substance is capable of causing a particular disease, while the question of specific causation focuses on whether the substance did, in fact, cause the disease in a specific individual.
 
 See, e.g., Berry v. CSX Transp., Inc.,
 
 709 So.2d 552 (Fla. 1st DCA 1998). The federal courts have held that in toxic tort cases, a plaintiff must prove both general causation and specific causation.
 
 See, e.g., Norris v. Baxter Healthcare Corp.,
 
 397 F.3d 878, 881 (10th Cir.2005) ("Plaintiff must first demonstrate general causation because without general causation, there can be no specific causation.”).